## STATE OF CONNECTICUT *v.* THOMAS MARRA, JR.
## (11214)

PETERS, C. J., PARSKEY, SHEA, DANNEHY and F. HENNESSY, Js.

Argued December 11, 1984—decision released March 12, 1985

*John R. Gulash, Jr.,* with whom, on the brief, was *Richard Emanuel,* for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Frank S. Maco,* assistant state's attorney, for the appellee (state).

PARSKEY, J. The defendant, Thomas Marra, Jr., was charged by an amended information with one count of first degree larceny in violation of General Statutes §§ 53a-119 (2) and 53a-122 (a) (2),[1] one count of second degree larceny in violation of General Statutes §§ 53a-119 (8) and 53a-123 (a) (1),[2] and one count of second degree forgery in violation of General Statutes

---

[1] "[General Statutes] Sec. 53a-119. LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . .

"(2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person. . . ."

"[General Statutes] Sec. 53a-122. LARCENY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and: (1) The property or service, regardless of its nature and value, is obtained by extortion, (2) the value of the property or service exceeds ten thousand dollars, (3) the property consists of a motor vehicle having a value exceeding two thousand dollars, or (4) the property is obtained by defrauding a public community, and the value of such property exceeds two thousand dollars. . . ."

[2] "[General Statutes] Sec. 53a-119. LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . .

"(8) Receiving stolen property. A person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner. A person who accepts or receives the use or benefit of a public utility commodity which customarily passes through a meter, knowing such commodity (1) has been diverted therefrom, (2) has

§ 53a-139 (a) (2).[3] The three counts related to the alleged sale by the defendant of a stolen automobile. The jury returned verdicts of guilty on all three counts and the defendant was sentenced to imprisonment for an effective term of not less than five nor more than ten years and was fined $4000. The defendant appeals from the judgment of conviction on several grounds, claiming that the trial court erred in: refusing to grant appropriate relief from the allegedly prejudicial effects of publicity; denying his request for a continuance; restricting his cross-examination of a witness for the state; and charging the jury. We find no error.

The jury might reasonably have found the following facts: On March 20, 1981, a black male identifying himself as Stuart Murray leased a 1980 Buick Century, bearing Connecticut registration plate TF 8789, from Budget Rent-a-Car Company in Bridgeport. On March 24, 1981, when the car had not been returned as provided in the rental agreement, the rental company reported to the Bridgeport police that it had been stolen.

In April, 1981, the defendant, an operator of a Bridgeport garage, agreed to sell the 1980 Buick to an Iranian student named Samad Aghamohammadi for $4500. The defendant presented Aghamohammadi with

---

not been correctly registered or (3) has not been registered at all by a meter, is guilty of larceny by receiving stolen property. . . ."

"[General Statutes] Sec. 53a-123. LARCENY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and: (1) The property consists of a motor vehicle, the value of which is two thousand dollars or less. . . ."

[3] "[General Statutes] Sec. 53a-139. FORGERY IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed . . . (2) a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant . . . ."

an auto registration form, dated April 8, 1981, for a 1980 Buick Century, marker plate number WC 5414. The form listed "Robert Hicks" as the seller of the vehicle. At the time Aghamohammadi took possession of the car, it bore the registration plate WC 5414.

On June 23, 1981, Aghamohammadi visited the Bridgeport office of the motor vehicle department in an effort to obtain title to the car. He tendered the registration form to a department employee who determined that the document was not a valid registration. Department records revealed that the 1980 Buick had been reported stolen, and that marker plate number WC 5414 was assigned to a 1975 Fiat which had been towed to the defendant's garage in an unrelated incident on April 8, 1981. Consequently, the Bridgeport police recovered the Buick at the motor vehicle department on June 23 and brought Aghamohammadi to the police station where he gave a statement identifying the defendant as the seller. At that point, Aghamohammadi had paid approximately $3500 of the $4500 purchase price to the defendant.

After the Buick was seized by the police, Aghamohammadi and the defendant had several telephone conversations, three of which Aghamohammadi taped. During the first two taped conversations, the defendant pressured Aghamohammadi for the remaining $1000 owed on the purchase price. In the third conversation, the defendant insisted that he had not sold the car to Aghamohammadi. He contended that the actual sellers were two black males, one of whom was the Robert Hicks whose name appeared on the registration form, and both of whom were present when Aghamohammadi agreed to buy the car and when the defendant presented him with the registration and the keys.

When Aghamohammadi informed the defendant that he had a tape of conversations in which the defendant requested payment, the defendant told him not to give the tape to the police and promised to repay him. The defendant gave Aghamohammadi a check for $3500, but payment on the check was refused, apparently for lack of sufficient funds.

I

The defendant first claims that he was deprived of his constitutional rights to a fair trial by an impartial jury and to due process of law, as guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution and article first, sections 8 and 9, of the Connecticut constitution. His claim rests on the allegedly prejudicial effects of pretrial and on-trial publicity, from which he asserts the trial court failed to grant appropriate relief. After careful review of the record in this case, we conclude that the defendant did receive a fair trial.

The publicity at issue did not concern the offenses for which the defendant was on trial in this case. Rather, it stemmed from two totally unrelated incidents which took place between the time of the defendant's arrest in July, 1981, and his trial in late October and early November of that year. Most of the publicity concerned a blundered "sting" operation conducted by the F.B.I. and aimed at the Bridgeport superintendent of police. The defendant was used as the "bait" in an attempt to bribe the city official, but the plan backfired when the superintendent declined the defendant's offer of money and arrested him for bribery. Some news coverage was also given to the trial of a third party for insurance fraud. Defense counsel in that trial sought to mitigate his client's actions by implicating the defendant.

The sting incident attracted local and national media attention when it occurred in mid-August, 1981. Local publicity continued, however, and intensified in October in connection with the hotly contested Bridgeport mayoral election, held on November 3, 1981. The Republican challenger to the incumbent mayor had previously provided some legal assistance to the defendant, and the defendant had contributed to this candidate's campaign. This connection was exploited in political advertisements on the radio and in the press, and was reported in news coverage of the campaign. Two weeks before the election, a car belonging to the defendant's wife was firebombed while parked in front of Republican election campaign headquarters in Bridgeport, creating additional coverage by the local media. Finally, there was press coverage of federal court proceedings relating to bribery charges filed against the defendant by the state, which arose out of the F.B.I. sting attempt. Only one venireman had read an article about the charges in the instant case, but he was not selected to be a member of the jury and the defendant does not claim any prejudice from publicity concerning these offenses.

Although the remedy most commonly sought to reduce the adverse effects of pretrial publicity is a motion for a change of venue; see *State* v. *Vitale,* 190 Conn. 219, 227, 460 A.2d 961 (1983); *State* v. *Piskorski,* 177 Conn. 677, 682, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Hart,* 169 Conn. 428, 432, 363 A.2d 80 (1975); the defendant in this case made no such request. In fact, the first reference to publicity came not from the defendant but from the trial judge in his opening remarks to the first panel of prospective jurors. On the second day of jury selection, before any voir dire questioning by counsel had begun, the defendant made an oral motion for an "extension of time" or "any other

remedy" necessary to protect his right to a fair trial. In support of his motion, the defendant was permitted to introduce into evidence an envelope containing numerous newspaper and magazine articles that mentioned the defendant. The court acknowledged an awareness of the publicity, which it termed "extensive," but denied the defendant's motion for a continuance. The court did not rule out the possibility of relief, however, and explicity stated: "Right now, not having voir dired any jurors, we have no indication as to the impact of these articles. I intend to get into the subject to be sure that a fair and impartial juror [sic] is selected and I will also allow counsel to develop it. Should the voir diring of the panel begin to establish that the publicity is going to effect [sic] his right to a fair and impartial trial, the Court will certainly review this motion again."

At the beginning of court the following day, the defendant renewed his motion for "an extension of time or other appropriate remedy" and offered additional articles which were included in the file admitted the previous day. Again, the court denied the motion and allowed voir dire to continue. The court questioned prospective jurors individually and collectively, and permitted extensive voir dire examination by counsel. Individual questioning of twenty-eight venirepersons took place over the course of five days. Although some members of the venire panel were excused for cause due to extensive knowledge of the defendant or an admitted inability to try him impartially, others had never heard or read anything about him. Many who had heard of the defendant through media reports had only a vague and general knowledge of his involvement in the F.B.I. sting operation. As previously mentioned, only one venireman had read anything about the charges to be tried.

When requesting relief, such as a change of venue or a continuance, from the allegedly prejudicial effects of publicity, "the defendant has the burden of showing that he could not receive a fair and impartial trial. *State* v. *Rogers,* 143 Conn. 167, 172, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476 [1956]; *State* v. *Chapman,* 103 Conn. 453, 470, 130 A. 899 [1925]. More specifically, with regard to publicity in the news media, the defendant must show more than the mere fact of publicity. He must demonstrate that it was prejudicial and prevented him from being accorded a fair and impartial trial. *State* v. *Rogers,* supra, 172; *State* v. *Leopold,* 110 Conn. 55, 58, 147 A. 118 [1929]; *State* v. *Rocco,* 109 Conn. 571, 572, 145 A. 47 [1929]; *State* v. *Chapman,* supra." *State* v. *Hart,* 169 Conn. 428, 432–33, 363 A.2d 80 (1975). Although rulings on such motions are within the trial court's discretion; *State* v. *Hart,* supra, 433, and cases cited therein; "due to the grave constitutional implications attending such pretrial rulings, 'appellate tribunals have the duty to make an independent evaluation of the circumstances.' *Sheppard* v. *Maxwell,* 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 [1966]." *State* v. *Piskorski,* 177 Conn. 677, 685–86, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Vitale,* 190 Conn. 219, 227, 460 A.2d 961 (1983).

The defendant asserts that "[t]he record in this case adequately supports a finding of both presumptive or 'inherent' prejudice, and actual, 'identifiable' prejudice." "Although the general rule is that on appeal a defendant has the burden of proving actual jury prejudice if a conviction is to be reversed on grounds of prejudicial publicity . . . there is no need to show actual prejudice in the jury box 'in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice

highly likely or almost unavoidable.' " (Citations omitted.) *State* v. *Piskorski,* supra, 686. In *Piskorski,* this court conducted a comprehensive review of those cases in which the United States Supreme Court presumed prejudice. Id., 686–89; see *Sheppard* v. *Maxwell,* supra; *Estes* v. *Texas,* 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543, reh. denied, 382 U.S. 875, 86 S. Ct. 18, 15 L. Ed. 2d 118 (1965); *Rideau* v. *Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963). Without repeating our discussion of those cases, we conclude, as we did in *Piskorski,* that neither the nature nor the extent of the publicity in the case before us approached the level where prejudice could be presumed.

Rather than disclosing "a trial atmosphere that had been utterly corrupted by press coverage"; *Murphy* v. *Florida,* 421 U.S. 794, 798, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); the record indicates that few of the prospective jurors had any in-depth knowledge of the defendant, and there was no indication of obtrusive media presence at this trial. Although the defendant's name and face made frequent appearances in the local press at or near the time of the trial, much of what was reported could not be considered prejudicial per se. For example, the coverage of the firebombing incident was more likely to arouse sympathy than "ill will and vindictiveness." *Beck* v. *Washington,* 369 U.S. 541, 556, 82 S. Ct. 955, 8 L. Ed. 2d 98, reh. denied, 370 U.S. 965, 82 S. Ct. 1575, 8 L. Ed. 2d 834 (1962). Likewise, the mere fact of the defendant's cooperation with the F.B.I. would not necessarily prejudice the public against him; upon questioning, few prospective jurors inferred prior criminal conduct from the defendant's status as an F.B.I. informant. Finally, the connections drawn between the defendant and a candidate in the mayoral election had been noted by very few of the venirepersons, and were intended to prejudice the public against the candidate, who was in fact elected, rather than the

defendant. That the defendant's name was familiar to many members of the venire panel is not sufficient to establish presumptive prejudice, as this court has previously stated that " '[w]e cannot accept the position that "prominence brings prejudice." ' " (Citation omitted.) *State* v. *Piskorski,* supra, 688.

In support of his claim that the publicity was inherently prejudicial, the defendant relies principally on the fact that several articles contained information regarding his prior convictions. He argues that because he planned to and did exercise his right not to testify, these reports disclosed prejudicial information that would not have been admissible evidence at trial. We note that despite trial counsel's claim that the defendant's "record has become a matter of public knowledge through the newspaper," very few venirepersons were aware of his criminal past. In addition, those articles that mentioned the defendant's prior convictions did so in a purely factual manner and did not detail the facts or circumstances of those crimes. Yet even if the defendant's criminal history had become a matter of common knowledge, this alone would not warrant a finding of presumptive prejudice. In *Murphy* v. *Florida,* supra, the United States Supreme Court rejected "the proposition that juror exposure to information about a state defendant's prior convictions . . . alone presumptively deprives the defendant of due process." Id., 799; see also *State* v. *Piskorski,* supra, 689. Thus, we decline to accept the defendant's claim of presumptive prejudice and turn to his argument of actual prejudice stemming from pretrial and on-trial publicity.

" 'Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity . . . and the existence of actual jury prejudice.' " (Citations omitted.) *State* v. *Piskorski,* supra, 689. This claim

requires us to examine the record to determine whether there was "constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected." *Dobbert* v. *Florida,* 432 U.S. 282, 303, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977). As previously stated, the voir dire examination of individual venirepersons was extensive, and defense counsel was permitted to explore the level and effects of each prospective juror's exposure to publicity concerning the defendant. Nevertheless, the defendant claims that the trial court failed adequately to minimize the allegedly adverse effects of pretrial publicity by: denying his motion to dismiss the first jury panel; refusing to grant the defendant additional peremptory challenges; overruling four of the defendant's challenges for cause; and denying two defense motions for a mistrial.

In the course of interviewing the first panel of prospective jurors, it became apparent that there were newspapers and a radio in the jury assembly room which carried media accounts concerning the defendant. There was also some discussion of these reports among certain of the venirepersons waiting to be examined. This information led the defendant to move that the entire panel be excused for cause, which motion the court denied. Since the defendant has failed to show that any of the venirepersons who were eventually selected as jurors were exposed to prejudicial material or discussion in the jury assembly room, we cannot say that the court's ruling was erroneous. *State* v. *Vitale,* supra, 229; *State* v. *Rocco,* 109 Conn. 571, 572–73, 145 A. 47 (1929). "[I]t was not unreasonable for the trial court to assume that the voir dire examination would disclose any prejudice upon the part of a prospective juror." *State* v. *Vitale,* supra.

The defendant also based his request for additional peremptory challenges on the existence of newspaper articles, radio reports and discussions about the defend-

ant in the jury assembly room. The defendant was accorded his right to exercise eight peremptory challenges, pursuant to General Statutes §§ 54-82g and 54-82h (a). The trial court's refusal to grant the defendant's request for additional challenges was a matter of discretion. "[A] ruling of the trial judge in the course of a voir dire examination is held to be reversible error only when the judge has clearly abused his discretion or harmful prejudice appears to have resulted." *State* v. *Anthony,* 172 Conn. 172, 175, 374 A.2d 156 (1976). Absent a showing that this ruling resulted in a jury that could not sit impartially on the defendant's case, we cannot conclude that it was erroneous. The nature of the publicity in this case was not so prejudicial that additional peremptory challenges were necessary to ensure the selection of a fair and impartial jury.

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irvin* v. *Dowd,* [366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).]" *Murphy* v. *Florida,* supra, 799. Five of the six jurors who composed the jury panel were not challenged and were deemed acceptable to the defendant and the state. In his brief on appeal the defendant does not claim, nor does the record support a claim, that he would have challenged any of these five jurors peremptorily had his statutory allotment of challenges not been exhausted. The sixth juror and the single alternate juror were challenged for cause by the defendant, both of which challenges were overruled by the court. In addition, the defendant had exercised peremptory challenges in two instances where the court had refused to excuse venirepersons for cause. Unless these rulings were erroneous, the defendant could not have been harmed by the denial of his request for additional peremptory challenges.

The basis upon which the defendant challenged both the juror and the alternate was the fact that they had

read newspaper articles informing them of other criminal matters in which the defendant was involved. Such knowledge, however, is not alone sufficient to disqualify a juror. "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy* v. *Florida,* supra, 799–800. Both prospective jurors were explicitly instructed by the court during voir dire that the matters as to which they had prior knowledge were totally unrelated to the offenses being tried, and each affirmed his understanding and acceptance of that fact. Neither juror had formed any opinion as to the defendant's character as a result of the information he had acquired through the media, and each believed that he could give the defendant a fair and impartial trial. Although "the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality'; [*Irvin* v. *Dowd,* supra, 723]"; *Murphy* v. *Florida,* supra, 800; the defendant has failed to indicate why either of these jurors should not have been taken at his word. "To succeed on a claim of bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact." *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d 1326 (1983); *State* v. *Bowen,* 167 Conn. 526, 356 A.2d 162 (1975); *State* v. *Clark,* 164 Conn. 224, 228, 319 A.2d 398 (1973). There is no indication in the record before us that either of these two jurors harbored any hostility toward the defendant that would prevent him from judging this case fairly and impartially. See *Dobbert* v. *Florida,* supra; *Murphy* v. *Florida,* supra.

Nor was the trial court incorrect in refusing to excuse for cause the two venirepersons who were then peremptorily challenged by the defendant. The first had indicated initially during the voir dire that she would infer from the fact of the defendant's arrest that "he did

something wrong." After some questioning by the court, however, she changed her response and agreed that an arrest carried no such implication. The defendant's challenge for cause was based upon this juror's first answer, which she had retracted. The court properly rejected this challenge. In the second instance, the venireperson had been exposed to essentially the same publicity as the sixth juror and the alternate juror. As previously stated, nothing in the record warrants our overturning the trial court's view that such exposure, in the light of the assurances of impartiality each of these venirepersons gave during the voir dire, would not deprive the defendant of a fair trial.

Finally, we address the defendant's claim that the trial court erred in denying his motions for a mistrial. At the beginning of the second day of trial, defense counsel informed the court that there had been media reports the previous day concerning the defendant but not involving the instant case. The court was presented with two newspaper articles in which it was reported that an attorney in an unrelated federal case sought the criminal record of the defendant, a prospective witness in that case. Both articles were purely factual accounts and were entirely free of sensationalism.

At the defendant's request, the court brought the existence of the publicity to the jury's attention and asked whether any of the jurors had been exposed to it. Only the one juror who had been challenged for cause and the alternate juror responded in the affirmative. The court agreed with defense counsel that voir dire examination of the two jurors was appropriate, but even before voir dire was commenced, the defendant moved for a mistrial. The ground for this motion was that because the articles mentioned the defendant's criminal record, and the defendant did not plan to testify on his own behalf, the fact that two jurors had seen the articles "would be enough per se to taint this jury

to such an extent that even on voir dire the matter could not be rectified." The trial judge responded that "[p]rior to voir diring, the motion is denied," and noted that he was aware of no precedent holding that mere knowledge of a defendant's criminal record required a juror's disqualification. As we have previously discussed, the court's understanding of the law in this regard was entirely correct. See *Murphy* v. *Florida,* supra, 799; *State* v. *Piskorski,* supra, 689.

Upon voir dire examination, one juror testified that he had read part of one article. He asserted, however, that he was unaware of the defendant's criminal background and that nothing he had learned had caused him to form a detrimental opinion of the defendant's character. He stated that "I still have as open a mind as I did to begin with" and indicated that he was able to "judge this case squarely on the facts of this case." The alternate juror testified that he had merely spotted the defendant's name in a headline but had not read the article.

After hearing the arguments of counsel and deliberating on the question, the court excused the juror who had read the article. The defendant again moved for a mistrial, which the court denied, and the alternate was sworn into the jury. At that point, upon defense counsel's request, the court instructed the entire jury to disregard all publicity concerning the defendant and cautioned the jurors as follows: "[I]f, at any time . . . you inadvertantly come to the conclusion that you can no longer act as a fair and impartial juror, if you have reached some conclusion from sources outside of the evidence put on in this courtroom, even though it will result in a mistrial to the State, you owe it to [the defendant], you owe it to the judicial system to advise us immediately of that fact. . . . [Y]ou owe it to yourselves . . . that at any time you feel you have come

to a conclusion that you can no longer give the accused a fair and impartial trial, to report it."

" 'The general principle is that a mistrial should be granted only as a result of some occurrence on the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial.' *State* v. *Bausman,* 162 Conn. 308, 312, 294 A.2d 312 (1972)." *State* v. *Vitale,* supra, 230. Here the trial court was careful to ensure that the jurors retained an attitude of impartiality in judging the defendant's case. On these facts we are not persuaded that the trial court abused its discretion in concluding that the defendant's right to a fair trial was not in any way impaired and in denying his motions for mistrial.

We recognize that a defendant bears a difficult burden when he is required to establish that he has actually been prejudiced by pretrial or on-trial publicity. We do not condone the presence in the jury room of newspapers or radios that inform venirepersons about the criminal record of a defendant who is entitled to exercise his constitutional right not to testify in his own behalf. The issue before us is not whether, under these circumstances, the trial court might not properly have responded more affirmatively to the defendant's requests for procedural relief. It was, however, not an abuse of its discretion to act as it did, because the extensive use of voir dire and the detailed instructions to the jurors were reasonably effective in protecting the defendant's right to a fair trial.

## II

The defendant next claims that the trial court erred in denying his written motion for a continuance, filed on October 28, 1981. Through this motion, the defendant requested that trial be delayed one week to enable him to inspect the tape recording made by Samad Aghamohammadi and the 1980 Buick Century which

was the subject of the alleged larceny. The tape recording had only come to the attention of the state's attorney's office on October 26, 1981, and the defendant was first informed of its existence the following day. The Buick had been returned to Budget Rent-a-Car shortly after it was seized by the police in late June, 1981, and was subsequently sold to a private citizen.

At the time of the defendant's motion, defense counsel had already had an opportunity to listen to the tape, which was approximately ten to fifteen minutes long. In addition, the state's attorney made available to the defendant the name and address of the Buick's current owner, stating that the vehicle was "available for inspection by defense any morning on any day of the week." Noting that a pending federal case against the defendant was scheduled to begin the following week and that "this Court has no confidence that [the defendant] will be available to this Court following his trial in the Federal Court," the judge denied the defendant's request for a one week continuance. The court stated, however, that proceedings could be delayed for a limited time to facilitate inspection of the car and the tape, and did in fact adjourn until the following afternoon, giving the defendant the afternoon of October 28 to examine further the tape and the morning of October 29 to inspect the vehicle. The defendant claims that this ruling by the trial court constituted an abuse of discretion and violated his federal and state constitutional rights to due process and to prepare and present a defense. We disagree.

"[T]he decision to grant or deny a continuance lies within the discretion of the trial court. *State* v. *McKnight,* 191 Conn. 564, 576–77, 469 A.2d 397 (1983); *State* v. *Jeustiniano,* 172 Conn. 275, 284, 374 A.2d 209 (1977); *State* v. *Bethea,* 167 Conn. 80, 84, 355 A.2d 6 (1974). Our inquiry on appeal is limited to whether the trial court abused its broad discretion. . . . 'It must

be shown that the trial judge acted arbitrarily and substantially impaired the defendant's ability to defend himself, before an appellate court will conclude that the trial judge abused his discretion.' *United States* v. *Ellenbogen,* 365 F.2d 982, 985 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S. Ct. 892, 17 L. Ed. 2d 795 (1967).'' *State* v. *Myers,* 193 Conn. 457, 463, 479 A.2d 199 (1984).

The defendant has failed to demonstrate any specific prejudice to his defense arising from the trial court's denial of his motion for a continuance of one week. The court considered his request and delayed proceedings for a period of time which it deemed appropriate under the circumstances. There is no indication that defense counsel ever attempted to inspect the Buick, although the state had provided the name, address and telephone number of the car's owner and had indicated the feasibility of such inspection. With regard to the tape recording, the defendant was given ample opportunity to evaluate the tape, particularly in light of its length. Pursuant to a motion by the defendant, the state was not permitted to introduce the tape as part of its case in chief. Rather, the tape was offered as a full exhibit by the defendant upon cross-examination of Aghamohammadi, and full transcripts of the recording were distributed to each juror. On these facts, we cannot conclude that the trial court abused its discretion by refusing to delay trial a week, nor can we see how the defendant was harmed by the way in which the court responded to his request.

## III

The defendant claims that the trial court unconstitutionally restricted his cross-examination of Samad Aghamohammadi in violation of the confrontation clauses of the federal and state constitutions. Aghamohammadi, the alleged victim of the larceny and a key witness for the state, was a foreign exchange stu-

dent from Iran. During the course of cross-examination, the defendant tried to elicit information regarding Aghamohammadi's employment status while studying in the United States. It appears that the defendant wanted to impeach the witness' credibility by offering evidence that he had accepted employment in violation of the conditions of his visa. Aghamohammadi expressed reluctance to respond to the defendant's inquiry and, after excusing the jury, the court pursued the matter with him. The witness told the court that he was not sure whether or not he was permitted to work while he was in the United States as an exchange student. Concerned that Aghamohammadi might face deportation were he to admit that he had been employed in response to the defendant's question, the court ruled that he would not be required to answer any further questions regarding his employment.

On appeal, the defendant argues that he should have been permitted to pursue this line of questioning in an effort to impeach the witness' credibility with evidence of specific acts of misconduct. In general, proof of prior specific acts of misconduct other than felony convictions is prohibited unless the particular acts bear a "special significance upon the issue of veracity . . . ." *State* v. *Orsini,* 187 Conn. 264, 268, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982). "It does not follow, however, that if the acts inquired about are indicative of a lack of veracity, the court must permit the cross-examination. Whether to permit it lies largely within the court's discretion." (Footnote omitted.) *Vogel* v. *Sylvester,* 148 Conn. 666, 676, 174 A.2d 122 (1961).

The defendant has not shown how the mere acceptance of employment in violation of immigration restrictions is indicative of a lack of veracity. Nor is there any indication that criminal charges relating to such employment were pending against the witness,

entitling the defendant to cross-examine him for bias or interest. *State* v. *Orsini,* supra. The defendant was in fact permitted to ask Aghamohammadi several specific questions relating to his employment at the beginning of cross-examination, and we cannot say that the court abused its discretion by limiting the scope of this inquiry.

## IV

Finally, the defendant raises two claims of error with regard to the court's jury instructions. Near the conclusion of the charge, the trial court stated: "The State does not wish to have an innocent person acquitted as in (sic) having a guilty person punished; but for the safety and well being of all the citizens of the state and for the protection of life and property, the State is concerned in securing the convictions of persons who have been proven guilty beyond a reasonable doubt of committing a crime." Although the defendant took no exception to this portion of the charge, he asserts that this claim is reviewable under the second "exceptional circumstance" of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), namely, "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." Id.

Although the defendant concedes that the trial court's statement that "[t]he State does not wish to have an innocent person acquitted" was "probably inadvertent," he asserts that it was improper and violated his due process rights. " ' "To determine whether an error in a charge constitutes reversible error, the court must consider the whole charge. . . . In considering the charge as a whole we eschew critical dissection . . . thereby not passing upon the instructions attacked in 'artificial isolation' from the whole charge. . . . The charge must be considered from the

standpoint of its effect on the jury in guiding them to a proper verdict." ' (Citations omitted.) *State* v. *Corchado,* [188 Conn. 653, 660–61, 453 A.2d 427 (1983)]." *State* v. *Reid,* 193 Conn. 646, 660, 480 A.2d 463 (1984). The test to be applied where a claimed error in the jury charge raises a constitutional question is whether it is reasonably possible that the jury was misled. *State* v. *Williams,* 182 Conn. 262, 268, 438 A.2d 80 (1980).

The jury instructions contained repeated admonitions that the state bore the burden of proving the defendant's guilt beyond a reasonable doubt; that the defendant was presumed innocent until proven guilty; and that the defendant was not required to prove his innocence. Given the context of the charge as a whole, we cannot conclude that this inadvertent statement by the trial court could have reasonably led the jury to convict an innocent man, or that it clearly deprived the defendant of a fundamental constitutional right and a fair trial. *State* v. *Evans,* supra, 70.

The defendant's second claim of error in the jury instructions concerns the court's charge on the defendant's failure to testify.[4] He bases his claim on General Statutes § 54-84 (b) which provides in pertinent part: "Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to tesify. . . ." This court has held that a trial court's failure to instruct in accordance with that statute constitutes plain error. *State* v. *Tatem,* 194 Conn. 594, 595–96, 483 A.2d 1087 (1984); *State* v. *Carrione,* 188 Conn. 681, 685 n.3, 453

---

[4] The court charged the jury: "The accused has not testified in this case. An accused person is under no obligation to become a witness in his own behalf under our law, and an accused person may either testify or not as he sees fit. It is for the State to prove him guilty and no burden rests upon him to prove his innocence. It may be good and sufficient reason why the defendant has not testified such as the advice of counsel and so forth. No inference or taint should be derived from such failure to testify."

A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983); *State* v. *Burke,* 182 Conn. 330, 331-32, 438 A.2d 93 (1980).

In this case, however, the defendant did "request otherwise." He filed two requests to charge on this issue, one of which included the instruction that "[n]o inference or taint should be derived from [the defendant's] failure to testify." The other requested instruction included the adjective "unfavorable" as modifying the word "inference." The court simply read the former instruction, apparently unaware that the defendant had also submitted a slightly different version in his request to charge. The defendant took an exception to this portion of the charge and requested that the court repeat the instruction, inserting the word "unfavorable." The court refused this request out of concern that to repeat the charge would merely emphasize the defendant's failure to testify.[5]

---

[5] The exchange between defense counsel and the court concerning the instruction was as follows:

"Counsel: [W]ith regard to one of your requests of charge 'Unfavorable inference for failure of the defendant to testify'; your Honor left out the word 'Unfavorable.' You told the jury they may draw no inference from the failure to testify. I believe the case law is that—and they use it in quotes—they use no unfavorable inference charged. That's the standard law and I wish that your Honor would tell the jury the word 'Unfavorable.' That's what the charge is known as in the last few years.

"The Court: I read it the way you gave it to me.

"Counsel: I think we gave you the old charge, unfortunately but on the request to charge, we did say, 'No unfavorable inference for failure for the defendant to testify.' I believe the way the cases read now, that your Honor—if your Honor does instruct on that charge, at the request of defense, that you are supposed to put in the word 'unfavorable.' I realize the old charge we gave you didn't have it, but evidentally [sic] the later cases required it.

"The Court: Why didn't you put it down when you gave it to me?

"Counsel: It's on this sheet. We just didn't notice it on the old one. That's all. Sorry about that; but it's on our request to charge.

"The Court: Court will allow it to stand. The Court thinks it is sufficient. I would have read the word 'unfavorable' had it been presented to me; but I won't highlight it by bringing it out again."

Although normally "a party cannot be heard to complain about an alleged error in an instruction given at his request"; *State* v. *Shipman,* 195 Conn. 160, 165, 486 A.2d 1130 (1985); we will address the defendant's claim in this instance because of its constitutional dimension. *State* v. *Tatem,* supra, 595–96; *State* v. *Burke,* supra, 331–32. The defendant relies on our recent decision in *Tatem* overturning a conviction because the trial court had instructed the jury that it could " 'draw no *unreasonable* inference from the accused's failure to testify.' (Emphasis added.)" *State* v. *Tatem,* supra, 596. We found that instruction to constitute harmful error, noting that "it is not inherently unreasonable to draw an inference of guilt from the defendant's silence"; id., 598; and concluding that, upon examination of the charge as a whole, there was a reasonable possibility that the jury was misled by the erroneous charge. Id., 599–600.

In this case, however, the jury was told that it could draw "*no* inference or taint" from the defendant's failure to testify. (Emphasis added.) An instruction prohibiting any inference would also preclude an unfavorable inference. Furthermore, the word "taint" implies unfavorability. Although this instruction was not in strict compliance with General Statutes § 54-84 (b) in that the word "unfavorable" was not used, the substantive meaning of the statutory requirement was conveyed. See *State* v. *Carrione,* 188 Conn. 681, 685–86, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983). Moreover, we note that in the course of voir dire examination, each and every member of the jury was instructed that the defendant had the right not to testify and that the jury could draw no unfavorable inference from his exercise of that right. The trial judge repeated this admonition in his remarks to the jury at the commencement of trial. Under these circumstances,

we do not find it reasonably possible that the jury was misled by the court's omission of the word "unfavorable" in its charge.

There is no error.

In this opinion the other judges concurred.