******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DUSTIN RUOCCO
(SC 19387)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued January 25—officially released September 6, 2016*

*Jennifer F. Miller*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Marc G. Ramia*, senior assistant state's attorney, for the appellant (state).

*Alice Osedach*, assistant public defender, with whom, on the brief, was *Katrina Cessna*, certified legal intern,

for the appellee (defendant).

*Opinion*

PALMER, J. After a jury found the defendant, Dustin Ruocco, guilty of burglary in the third degree and larceny in the third degree, the Appellate Court reversed his conviction upon concluding that it was plain error for the trial court not to instruct the jury, as mandated by General Statutes § 54-84 (b),[1] that it may draw no unfavorable inferences from the defendant's failure to testify. *State* v. *Ruocco*, 151 Conn. App. 732, 744, 754, 95 A.3d 573 (2014). We granted the state's petition for certification to appeal, limited to the issue of whether the Appellate Court properly reversed the defendant's conviction under the plain error doctrine. *State* v. *Ruocco*, 314 Conn. 923, 100 A.3d 854 (2014). We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court, as supplemented by the record, sets forth the following facts that the jury reasonably could have found. "The defendant and his girlfriend, Denise Cintron, rented a basement apartment from Thomas Blake in [the town of] East Haven. Blake's property is immediately adjacent to property owned by Donald Gennette (Donald) and Maria Gennette (Maria). There is a shed in the backyard of the Gennettes' property located approximately twenty feet from the Gennette-Blake property line.

"On May 5, 2011, Donald and Maria went to work at 6:20 a.m. and 7:15 a.m., respectively. Maria returned home at 11:40 a.m. to take care of her grandchild while her son went to work. Upon arriving home, Maria observed the defendant and Cintron sitting in the defendant's vehicle, a red Toyota Corolla. Maria then took her dog for a walk in her backyard and observed that the defendant's car, although on the Blake property, was parked immediately next to the Gennette-Blake property line. Maria noted that the defendant's car was parked in close proximity to her shed and that the location of the car was unusual because she had never seen the car parked there before. Maria observed that Cintron was now alone in the vehicle.

"Cintron exited the vehicle and began to ask Maria questions about her dog. This interaction was unusual, according to Maria, because Cintron had never spoken to her during the nine months that Cintron had resided on the Blake property. After Cintron . . . questioned her for about two minutes, Maria went back inside her house. Approximately ten minutes later, at 12:15 p.m., Maria, her son, and [her] grandchild departed, leaving no one in the house. Upon leaving, Maria observed that the defendant's car had not moved.

"Maria returned home at 3:15 p.m. and noticed that an exterior light on the shed was turned on, which she described as unusual. Donald, an experienced electrician, explained how he had wired the exterior light on the shed. He explained that a switch inside the shed

controls the exterior light. If the switch is in one position, the light stays on continuously. If the switch is in the other position, the light is controlled by a motion sensor mounted on the exterior of the shed. The motion sensor will [cause] the light [to turn] on if someone moves in front of [the sensor]. He explained, however, that he configured the motion sensor so that it is disabled while it is light outside. The only explanation for the light being on during the day is that someone went inside the shed and put the switch in the position that turns the light on continuously. According to Donald, on May 5, 2011, the exterior light was off when he left for work and should have remained off throughout the day.

"Donald was 'suspicious' after Maria told him that the defendant's car had been parked on the property line and that the exterior light on the shed was on when she arrived home. Donald went into the shed and noticed [that] several items were missing. He immediately called the police and spoke with his neighbor, [Ricardo] Gallo, who resides on the other side of the Gennettes' property. Gallo was unemployed at the time and testified that he was home painting his son's room on the date in question.

"At 2 p.m. on May 5, 2011, Gallo observed the defendant enter the Gennettes' shed, remove items from it, and place them in the trunk of [his] car, which was parked in close proximity to the Gennette-Blake property line. Gallo stated that, although he observed someone other than one of the Gennettes removing items from their shed, he '[did not] want to assume that [the defendant] was stealing' because it was possible that the defendant was assisting Donald with his work as an electrician. Gallo later reported his observations to the police after Donald notified him that he called to report the burglary.

"Officer Craig Michalowski of the East Haven Police Department responded and met with Donald, Maria, Gallo, and Blake. Donald told Michalowski that the following items were taken from his shed: (1) a chain saw; (2) a miter saw; (3) a drill; and (4) a 'cordless kit' containing a drill and two saws. The next day, after Donald conducted a more thorough search of the shed, he reported to the police that he was also missing (1) sixty to seventy feet of 'two aught' copper wire, (2) 'a couple [of] rolls' of 'number two' wire, (3) approximately 750 feet of yellow 'Romex' wire, and (4) approximately 750 feet of white 'Romex' wire. Donald had this wire on hand in order to perform a specific modification to his house's electrical system.

"After his initial investigation, Michalowski identified the defendant as a potential suspect . . . . He continued the investigation by checking the records from area scrap yards and pawn shops in order to determine whether the defendant sold any of the items taken from

the shed. Michalowski explained that when someone sells something to either a scrap yard or [a] pawn shop, the businesses keep a record of the date and time of the sale, the item sold, and the seller's name and address. The businesses send these records to the police department approximately every six weeks. Michalowski checked the records on file at the police department and found that, at 6:55 a.m. on the day after the burglary, the defendant sold wire to a scrap yard that was consistent with the type of wire reported missing from the Gennettes' shed.

"The defendant was arrested on June 14, 2011, and charged with burglary in the third degree and larceny in the third degree. At trial, the defendant [who did not testify, presented an alibi witness who claimed that the defendant was with him at the time of the alleged burglary. The defendant also] argued that Donald had lied about the amount of wire taken in order to defraud his insurance company. He specifically argued that Donald's account of the amount and value of the wire taken from the shed was inconsistent. Moreover, the defendant argued that the amount of wire purportedly in the shed was disproportionate to the amount necessary to modify the electrical system for the Gennettes' house, as Donald had claimed. [In addition, the defendant maintained that the amount of wire and tools Donald claimed had been stolen could not have fit inside the trunk of the defendant's vehicle. In light of the foregoing, the defendant further argued that] the state did not prove beyond a reasonable doubt that the property taken was worth more than $2000, the amount necessary to [sustain a conviction] of larceny in the third degree pursuant to [General Statutes] § 53a-124 (a) (2)." (Footnotes omitted.) *State* v. *Ruocco*, supra, 151 Conn. App. 735–38.

At the conclusion of the evidentiary portion of the trial, the court instructed the jury on the governing legal principles. Although the defense made no contrary request, the trial court did not instruct the jury, as required by § 54-84 (b), that it could draw no unfavorable inferences from the defendant's failure to testify. Thereafter, the jury returned a verdict of guilty on both counts, and the trial court rendered judgment in accordance with the verdict.

The defendant appealed to the Appellate Court, claiming, inter alia, that the trial court's failure to instruct the jury in accordance with § 54-84 (b) was plain error entitling him to a new trial. The Appellate Court agreed, stating in relevant part: "[T]he total omission of the no adverse inference instruction is plain error that is not subject to a harmless error analysis. The unconditional language of the statute is a legislative mandate, and the failure to use that language is a pivotal aspect of the defendant's privilege against self-incrimination. The statutory language is based on a constitu-

tional right, and its omission can never be harmless."[2] (Internal quotation marks omitted.) Id., 743–44, quoting *State* v. *Suplicki*, 33 Conn. App. 126, 130, 634 A.2d 1179 (1993), cert. denied, 229 Conn. 920, 642 A.2d 1216 (1994).

On appeal, the state contends that the Appellate Court incorrectly determined that the total omission of the statutorily required no adverse inference instruction was not subject to harmless error analysis. The state further maintains that, if the Appellate Court had undertaken such an analysis, as it was required to do, it would have recognized that the defendant was not prejudiced by the omission of the required instruction because "the balance of the instructions facilitated the appropriate application of the law" and because the evidence of the defendant's guilt was so overwhelming that the verdict would have been the same even if the instruction had been given. We are not persuaded.

The following legal principles guide our analysis of the state's claim. "It is well established that the plain error doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Footnote omitted; internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 595–96, 134 A.3d 560 (2016).

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate." (Internal quotation marks omitted.) Id., 596.

"This court has had a number of opportunities to review the failure of a trial court to incorporate the requirements of § 54-84 (b) into its instructions to the jury. In none of these cases had the defendant taken an exception at trial. In each of them we chose to review the claim on its merits. [See, e.g.] . . . *State* v. *Tatem*, 194 Conn. 594, 595, 483 A.2d 1087 (1984); *State* v. *Carri-*

*one*, 188 Conn. 681, 685 [and] n.3, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983); *State* v. *Boulware*, 183 Conn. 444, 446, 441 A.2d 1 (1981); *State* v. *Carter*, 182 Conn. 580, 581, 438 A.2d 778 (1980); *State* v. *Burke*, 182 Conn. 330, 331, 438 A.2d 93 (1980). . . . [W]e explained that noncompliance with § 54-84 (b) is [patent] error because the statute serves to effectuate the fundamental constitutional right of a defendant not to testify in his criminal trial. That right has its origin in the privilege against self-incrimination under both the federal and the state constitutions. Without proper instructions, as the United States Supreme Court and this court have . . . independently recognized, a jury may prejudge a defendant because he failed to take the stand and protest his innocence in the face of a criminal accusation. *Carter* v. *Kentucky*, 450 U.S. 288, 305, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981) . . . . A trial court's failure to limit juror speculation on the meaning of a defendant's silence exacts an impermissible toll on the full and free exercise of the privilege [against self-incrimination]. [Id.] That rationale is fully appropriate to the application of the mandate of § 54-84 (b) . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Sinclair*, 197 Conn. 574, 582–83, 500 A.2d 539 (1985). Accordingly, because the trial court's omission of the no adverse inference instruction "is of constitutional dimension, [t]he applicable test requires the state to prove beyond a reasonable doubt that, from the viewpoint of the charge as a whole, there is no reasonable possibility that the jury was misled."[3] (Internal quotation marks omitted.) *State* v. *Townsend*, 206 Conn. 621, 626, 539 A.2d 114 (1988).

In *State* v. *Sinclair*, supra, 197 Conn. 574, we queried, in dictum, "whether total noncompliance with § 54-84 (b) can ever be harmless." Id., 584. We ultimately determined, however, that it was unnecessary to resolve that question because our review of the record persuaded us that the state had failed to prove the harmlessness of the error. Id., 586. Thereafter, in *State* v. *Suplicki*, supra, 33 Conn. App. 126, the Appellate Court elected to decide the question that we left open in *Sinclair* and concluded that the total omission of the no adverse inference instruction is not amenable to harmless error analysis. Id., 130. On the basis of its conclusion in *Suplicki*, the Appellate Court reversed the defendant's conviction in the present case. See *State* v. *Ruocco*, supra, 151 Conn. App. 743–44.

We also need not decide that question today because, even if a violation of § 54-84 (b) is subject to harmless error analysis, the state cannot establish that the violation in the present case was harmless beyond a reasonable doubt. As we previously indicated, the defendant presented an alibi witness who testified that the defendant was with him at the time of the alleged burglary. Inconsistencies in Donald's testimony regarding the

amount of wire that was taken and what he planned to do with it also lent support to the defendant's contention that Donald, with the assistance of Gallo, had lied to the police about the burglary in order to defraud Donald's insurance company. Thus, although the state's case was sufficient to support the jury's finding of guilt—in addition to the testimony of Donald and Maria, there was other testimony that, after the burglary, the defendant sold a small quantity of electrical wire "consistent" with the wire that was reported missing—it was not so ironclad that we can conclude, as a matter of law, that the instructional omission was harmless.

Our conclusion is consistent with our decision in *State* v. *Dudla*, 190 Conn. 1, 458 A.2d 682 (1983). In that case, a police officer testified that he witnessed the defendant, James R. Dudla, toss a gun near where he was standing during a routine traffic stop. See id., 6–7. In reversing Dudla's conviction for illegal possession of a firearm, this court observed that, "[a]lthough the evidence presented might have been sufficient to support a conviction, this court will not presume to hold that the jury necessarily found [the officer's] testimony to be true. The jury [is], of course, the sole [judge] of [the] credibility of witnesses . . . [and is] free to reject even uncontradicted testimony, if [it does] not find it credible. . . . The jury might have doubted the uncorroborated testimony offered [to establish Dudla's] guilt . . . but [found] him [guilty] because he did not take the stand to deny his guilt." (Citations omitted.) Id., 7. "Because the jury might have considered [Dudla's] failure . . . to testify in determining the likelihood that the officer's testimony was true, [the court] cannot find the trial court's failure to give a no inference charge to be harmless error." (Internal quotation marks omitted.) Id. Likewise, given the discrepancies in Donald's testimony and the fact that there was only one eyewitness, namely, Gallo, we cannot discount the possibility that the jury might have doubted the Gennettes' and Gallo's testimony but found the defendant guilty because of his failure to testify.

Finally, we reject the state's contention that the defendant was not prejudiced by the omission of the instruction because "the balance of the instructions facilitated the appropriate application of the law." Specifically, the state argues that, because the jury was instructed regarding the presumption of innocence and the state's burden of proof, and because the jury is presumed to have followed those instructions, there is no reasonable probability that the jurors would have speculated as to the defendant's reasons for not testifying. In support of this claim, the state also relies on the fact that, during voir dire, the venire panel was instructed not to "hold [it] against him" if the defendant decided not to take the stand. As the state acknowledges, however, this court has considered whether the charge as a whole, including instructions given during

voir dire, adequately conveyed the substance of the instruction mandated by § 54-84 (b) when that charge included an instruction that deviated only slightly from the statutory language. See, e.g., *State* v. *Marra*, 195 Conn. 421, 443–44, 489 A.2d 350 (1985) (although final charge "was not in strict compliance with . . . § 54-84 [b] in that the word 'unfavorable' was not used, the substantive meaning of the statutory requirement was conveyed [by the balance of the charge]"); *State* v. *Carrione*, supra, 188 Conn. 684–86 (harmless error when jurors were told "to draw no legal impressions from the fact that [the defendant] did not take the stand and testify" because, immediately thereafter, they were also told "not to penalize [the defendant] for not testifying and taking advantage of her constitutional right" [internal quotation marks omitted]). When, however, as in the present case, the jury charge contains no language that resembles the instruction mandated by § 54-84 (b), we cannot assume that the jurors had sufficient knowledge of the law to be able to glean from the balance of the instructions that they should draw no adverse inference from the defendant's failure to testify. Cf. *State* v. *Tatem*, supra, 194 Conn. 600 (because " '[w]e cannot assume that lay jurors know what lawyers and judges know,' " fact that jury was instructed regarding state's burden and defendant's right to remain silent did not cure defects in § 54-84 [b] instruction). Accordingly, the state has failed to demonstrate that a new trial is unnecessary despite the trial court's complete omission of the instruction mandated by § 54-84 (b).

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and ZARELLA, EVELEIGH and McDONALD, Js., concurred.

[1] General Statutes § 54-84 (b) provides: "Unless the accused requests otherwise, the court shall instruct the jur[ors] that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence."

[2] "The defendant's right not to testify is rooted in the privilege against self-incrimination under both the federal and the state constitutions. The fifth amendment to the United States constitution provides that no person shall be compelled in any criminal case to be a witness against himself. That provision [in conjunction with the due process clause of the fourteenth amendement] acts as a restraint [on] the individual states . . . . *Malloy* v. *Hogan*, 378 U.S. 1, [6] 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Article first, § 8, of the Connecticut constitution affords criminal defendants a similar protection in language at least as broad as its federal counterpart. That section, which sets forth the rights of accused persons in criminal prosecutions, provides that [n]o person shall be compelled to give evidence against himself . . . ." (Internal quotation marks omitted.) *State* v. *Yurch*, 229 Conn. 516, 521–22 n.5, 641 A.2d 1387, cert. denied, 513 U.S. 965, 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994).

[3] We note that, ordinarily, under the second prong of the plain error test, it is the appellant's burden to demonstrate "that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Jamison*, supra, 320 Conn. 597. We previously have determined, however, that, because the statutorily mandated no adverse inference instruction was intended to effectuate a fundamental constitutional right, unless the defendant or defense counsel requests that the charge not be given, when the trial court fails to give that instruction, the burden is on the state to demonstrate that the omission was harmless beyond a reasonable

doubt. See, e.g., *State* v. *Yurch*, 229 Conn. 516, 523, 641 A.2d 1387, cert. denied, 513 U.S. 965, 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994).

---