## STATE OF CONNECTICUT *v.* LAWRENCE J. PELLETIER, JR.
### (13161)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and COVELLO, Js.

Argued October 6, 1988—decision released January 10, 1989

*Kent Drager,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*John O'Meara,* deputy assistant state's attorney, with whom, on the brief, were *Walter Scanlon,* chief assistant state's attorney, and *Patricia King,* assistant state's attorney, for the appellee (state).

COVELLO, J. After a jury trial, the defendant, Lawrence J. Pelletier, Jr., was found guilty of three counts of murder in the shooting deaths of three guards at the Purolator Armored Car Garage in Waterbury.[1] The defendant appealed his conviction and we ordered a new trial. *State* v. *Pelletier,* 196 Conn. 32, 490 A.2d 515 (1985) *(Pelletier I).* On remand, the defendant was convicted of three counts of felony murder in violation of General Statutes § 53a-54c, and sentenced to a term of incarceration of twenty-five years to life on each count, to run consecutively, for a total effective sentence of seventy-five years to life imprisonment.

The defendant appeals his conviction claiming that the trial court erred in: (1) denying his motion to transfer the prosecution; (2) denying his motion to excuse for cause certain prospective jurors; (3) deny-

---

[1] The facts of this case are more fully reported in *State* v. *Pelletier,* 196 Conn. 32, 490 A.2d 515 (1985), and *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

ing his motion to suppress evidence found in his home; (4) instructing the jury on alternative theories of criminal liability for which there was no evidence or insufficient evidence; (5) refusing to give his requested instruction on intoxication and lesser included offenses; (6) depriving him of his right to confrontation by admitting the hearsay statement of a codefendant; (7) refusing to allow him to present evidence of a potential third party culprit; and (8) imposing three separate punishments for three felony murder convictions based on the same underlying felony. The defendant further claims that: (9) his second trial was barred by double jeopardy because of intentional prosecutorial misconduct at his first trial; (10) the grand jury indictment was improper because of the underrepresentation of hispanics on the grand juries in the Waterbury judicial district and the presence and participation of unauthorized persons in the grand jury room during those proceedings; (11) prosecutorial misconduct in the state's closing summation to the jury deprived him of a fair trial; and (12) he was denied his right to a speedy trial. We find no error.

I

We observe at the outset that the defendant has launched a wholesale attack on every aspect of this prosecution and some aspects of the preceding prosecution which this court has already disposed of in *Pelletier I*. This torrent of claimed error, including an issue that the defendant himself has directed to be argued,[2] serves neither the ends of justice nor the

---

[2] "The ABA Model Rules of Professional Conduct provide: 'A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. . . . In a criminal case, the lawyer shall abide by the client's decision . . . *as to a plea to be entered, whether to waive jury trial and whether the client will testify.*' Model Rules of Professional Conduct, Proposed Rule 1.2 (a) (Final Draft 1982) (Emphasis added). With the excep-

defendant's own purposes as possibly meritorious issues are obscured by the sheer number of claims that are put before us.

" 'Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue] . . . [M]ultiplying assignments of error will dilute and weaken a good case and will not save a bad one.' Jackson, Advocacy Before the United States Supreme Court, 25 Temple L. Q. 115, 119 (1951)." *Jones* v. *Barnes,* 463 U.S. 745, 752, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).

" 'Most cases present only one, two, or three significant questions. . . . Usually . . . if you cannot win on a few major points, the others are not likely to help. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones.' R. Stern, Appellate Practice in the United States 266 (1981)." *Jones* v. *Barnes,* supra.[3]

## II

The jury might reasonably have found that on April 16, 1979, three guards, Leslie Clark, Edward Cody and

tion of these specified fundamental decisions, an attorney's duty is to take professional responsibility for the conduct of the case, after consulting with his client." *Jones* v. *Barnes,* 463 U.S. 745, 753 n.6, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). The proposed ABA rule, quoted above, has been adopted in this state. See Rule 1.2 (a) of the Rules of Professional Conduct.

[3] We note the proposed American Bar Association Appellate Court Standards Governing Lawyers which provide: "A lawyer shall present to the court only the most promising issues that offer a reasonable chance of success. In most cases this will mean that not more than two or three issues will be raised, and only in rare instances will more than three issues be raised. A lawyer shall not raise an issue not properly preserved except under circumstances under which the appellate court is likely to waive the failure. In a criminal appeal, a lawyer may be obligated to raise additional issues." ABA Appellate Court Standards Governing Lawyers, Proposed Rule 3.41 (b) (9) (B) (Final Draft 1988).

William West, were shot to death at the Purolator Armored Car garage in Waterbury. Upon investigation police found that the exterior and interior of the garage were littered with twenty-four expended .30 caliber shell casings fired from two M-1 semi-automatic carbines. More than $1.7 million in cash, jewelry, food stamps and checks were missing. During their investigation the police spoke with a witness who claimed to have purchased an M-1 semi-automatic carbine for the defendant. The witness further stated that the defendant had discharged the weapon in the basement of his home at 23 Carmen Street in Waterbury. Based on this information the police obtained a search warrant for the defendant's home. In executing that warrant the police found two cartridge cases and some literature on the M-1 rifle. This material served as the basis for a subsequent search of a codefendant's house where the police later found two M-1 carbines along with the stolen property. The defendant was subsequently arrested and convicted of three counts of felony murder.

### III

The defendant first claims that the trial court erred in denying his pretrial motion to transfer the prosecution. The defendant argues that he was denied his right to a fair trial because the publicity surrounding the case was so pervasive that it was impossible for him to empanel an impartial jury. "The determination of whether a transfer of prosecution is necessary is a matter ordinarily entrusted to the sound discretion of the trial court. Nevertheless, 'due to the grave constitutional implications attending such pretrial rulings, "appellate tribunals have the duty to make an independent evaluation of the circumstances." *Sheppard* v. *Maxwell,* 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 [1966].' *State* v. *Piskorski,* [177 Conn. 677, 685–86, 419 A.2d 866, cert. denied, 444 U.S. 935, 100

S. Ct. 283, 62 L. Ed. 2d 194 (1979)]." *State* v. *Miller,* 202 Conn. 463, 477, 522 A.2d 249 (1987). After a review of the record, we conclude that the publicity attending this case did not deprive the defendant of an impartial jury and a fair trial. Therefore, we find no error.

Much of the pretrial publicity was published shortly after the robbery and murders took place and before the defendant's first trial which began on November 12, 1981. Before the start of his first trial the defendant moved to transfer the prosecution to a court location outside the judicial district of Waterbury. The trial court, *Hull, J.,* denied this motion. The defendant did not raise the issue of the denial of this motion in the appeal from his first trial. *State* v. *Pelletier I,* supra. Now, however, the defendant claims that the publicity surrounding his first trial, along with the most recent publicity incident to his second trial, which began on January 13, 1987, has precluded him from receiving a fair trial. We disagree.

During his second trial the defendant moved to transfer the prosecution pursuant to Practice Book § 835. That section provides in part that "any pending criminal matter be transferred to any other court location: (1) If . . . a fair and impartial trial cannot be had where the case is pending . . . ." This court has stated that " '[a]bsent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity . . . and the existence of actual jury prejudice' " in order to transfer a prosecution. *State* v. *Piskorski,* supra, 689, quoting *McWilliams* v. *United States,* 394 F.2d 41, 44 (8th Cir. 1968). We find that the defendant has shown neither inherently prejudicial publicity nor actual jury prejudice.

Our review of the record discloses that the pretrial publicity was extensive. The publicity involved television news reports, newspaper articles and radio broadcasts. The stories covered various aspects of the crime, the pretrial proceedings, the first trial, conviction, sentencing and appeal. The publicity also included codefendant Donald Couture's retrial and the initiation of the defendant's jury selection. "Nevertheless, '[w]e cannot accept the position that "prominence brings prejudice." ' " *State* v. *Piskorski,* supra, 688, quoting *Hale* v. *United States,* 435 F.2d 737, 747 (5th Cir. 1970), cert. denied, 402 U.S. 976, 91 S. Ct. 1680, 29 L. Ed. 2d 142 (1971). While the publicity was extensive, it was neither inflammatory nor inaccurate. We are not persuaded that the news coverage created a "trial atmosphere that had been utterly corrupted by press coverage." *Murphy* v. *Florida,* 421 U.S. 794, 798, 95 S. Ct 2031, 44 L. Ed. 2d 589 (1975). The media coverage involved "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Beck* v. *Washington,* 369 U.S. 541, 556, 82 S. Ct. 955, 8 L. Ed. 2d 98, reh. denied, 370 U.S. 965, 82 S. Ct. 1575, 8 L. Ed. 2d 834 (1962). We conclude, therefore, that the pretrial publicity was not so inherently prejudicial as to deny the defendant his right to a fair trial.

Moreover, the defendant has failed to demonstrate actual jury prejudice. The defendant claims that the best evidence of actual prejudice is found in the results of the voir dire examination of 381 venirepersons. Of those examined, the defendant claims that 199 were excused for cause because of prior knowledge of the case. This fact alone, however, does not establish actual jury prejudice.

Each prospective juror was thoroughly and extensively examined. The parties fully explored the "level and effects of each prospective juror's exposure to the

publicity concerning the defendant." *State* v. *Marra,*
195 Conn. 421, 431, 489 A.2d 350 (1985). While slightly
more than 50 percent of the prospective jurors had
prior knowledge of the case that would affect their abil-
ity to be impartial, of the twelve jurors and two alter-
nates actually selected, none had substantial knowledge
of the case or preconceived notions of the defendant's
guilt. It is clear that " '[q]ualified jurors need not . . .
be totally ignorant of the facts and issues involved.' "
Id., 433, quoting *Murphy* v. *Florida,* supra, 799–800.
Notably, none of the jurors or alternates selected knew
of the defendant's prior conviction. We conclude that
there was no connection between the pretrial public-
ity and actual jury prejudice and, therefore, that the
trial court did not abuse its discretion in denying the
defendant's motion to transfer the prosecution.

## IV

The defendant next claims that the trial court erred
in denying his motion to excuse for cause eight prospec-
tive jurors thereby forcing him to expend his peremp-
tory challenges. We find no error. The defendant argues
that eight venirepersons should have been excused for
cause because they had knowledge of the defendant's
prior conviction. This knowledge, the defendant argues,
is so inherently dangerous to his right to an impartial
jury that these prospective jurors should have been
excused for cause.

We disagree with the defendant's assertion for a
number of reasons. First, an examination of the rec-
ord discloses that the trial court granted the defend-
ant almost three times the number of challenges that
are prescribed by statute.[4] The defendant's claim,

[4] General Statutes § 54-82h provides in relevant part: "(a) In any crimi-
nal prosecution tried to a jury in the superior court if it appears to the court
that the trial is likely to be protracted, the court may, in its discretion, direct
that, after a jury has been selected, two or more additional jurors shall be

therefore, rests on the presumption that if he had not been forced to use those extra peremptory challenges on the eight prospective jurors, he might have used them to peremptorily challenge certain venirepersons who subsequently became jurors or alternates. This reasoning is speculative at best and clearly does not rise to the level of proof required to establish that the trial court abused its discretion in denying the defendant's for cause challenges.

Second, the eight venirepersons all indicated that their knowledge of the defendant's conviction would not affect their ability to be impartial.[5] Throughout the voir dire the trial court excused for cause those venirepersons it believed could not be impartial. In determining the credibility of prospective jurors and their ability to be impartial, the trial court has broad discretion. *State* v. *Ziel,* 197 Conn. 60, 65, 495 A.2d 1050 (1985). While each of the eight venirepersons in issue had some knowledge of the defendant's prior conviction, they all gave assurances that they could be unbiased and impartial. The trial court, in the exercise of its broad discretion, was satisfied with these assertions of impartiality. Under such circumstances, we are unable to find an abuse of discretion in the trial court's failure to excuse these people for cause.

Finally, the defendant did not accept any juror or alternate whom he requested to be removed for cause. Therefore, even if those prospective jurors were biased,

added to the jury panel, to be known as 'alternate jurors.' . . . [In such cases] the state and the accused may each peremptorily challenge . . . eighteen jurors if the offense is punishable by life imprisonment . . . ."

[5] During the course of voir dire the trial court told the parties that it "will excuse for cause any prospective juror who indicates an awareness and knowledge of the previous trial and conviction and at the same time expresses the slightest degree of uncertainty in his own mind as to how that would affect his thinking as a juror should he be selected in the present case. Should that combination of circumstances exist, the Court will exercise itself a challenge for cause and has done so already."

the defendant was not harmed because those individuals never became members of the jury.[6]

V

The defendant next claims that the trial court erred in failing to suppress the "fruits" of an illegal search of his home. The evidence found in the defendant's home, two cartridge cases and some literature on the M-1, served as the factual basis for the warrant issued to search the Couture home. It was there that the police found the weapons and stolen property which the court later admitted into evidence.

On April 17, 1979, the Waterbury police obtained a search warrant for the defendant's home. Less than twenty-four hours after the crime occurred, ten to twelve officers arrived at the defendant's home to execute that warrant. Upon arriving, a Waterbury inspector, using a bullhorn, identified himself, indicated that the police had obtained a warrant to search the house, and requested that anyone in the house come outside. The defendant came outside peaceably.

The defendant contends that although a search of his home was made pursuant to a valid search warrant, the search was nevertheless illegal because the executing officers violated the so-called "knock and announce" rule by using a bullhorn to announce their presence rather than knocking on the defendant's door. Therefore, the defendant concludes, the "fruit" of this illegal search, i.e., the weapons and stolen property, should have been suppressed. We find no error.

"From early colonial times we, in this jurisdiction, have followed the common-law requirement . . . that,

---

[6] The United States Supreme Court recently addressed a similar issue and held that the erroneous denial of a charge for cause presented no federal constitutional issue. *Ross* v. *Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988).

in the absence of some special exigency, before an officer may break and enter he 'ought to signify the cause of his coming, and to make request to open the doors.' " *State* v. *Mariano,* 152 Conn. 85, 94, 203 A.2d 305, cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1964), quoting *Semayne's Case,* 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194 (1907); *Read* v. *Case,* 4 Conn. 166, 10 A. 110 (1822). The "knock and announce" rule requires that an officer identify himself or herself, announce that the purpose of his or her presence is to execute a search warrant, and wait a reasonable time for the occupier to surrender his or her privacy voluntarily. *State* v. *Mariano,* supra. An executing officer's reasonable belief, however, " 'that announcement might place him or his associates in *physical peril* . . . constitutes exigent circumstances that justify noncompliance' " with the rule. (Emphasis added.) *United States* v. *Ramirez,* 770 F.2d 1458, 1460 (9th Cir. 1985), quoting *United States* v. *Manfredi,* 722 F.2d 519, 527 (9th Cir. 1983).

The trial court found that although the "knock and announce" rule was not complied with, the exigent circumstances surrounding the search excused the noncompliance. We need not determine whether the "knock and announce" rule was, in fact, complied with because we find that the exigent circumstances that existed at the time the officers executed the search warrant justified any possible noncompliance with that rule.

There are several reasons why it was reasonable for the officers to fear for their safety in executing this warrant. First, the police had not yet confiscated the weapons involved in the robbery and murders and had reason to believe that the defendant was in possession of at least one M-1 semi-automatic carbine. Second, the warrant was executed less than twenty-four hours after the crime occurred. Third, the underlying crime had been committed in an especially violent manner. The

police had found twenty-four expended .30 caliber shell casings from two M-1 semi-automatic carbines. Finally, the police had reason to believe that the defendant had discharged the semi-automatic weapon in his home on prior occasions. We conclude, therefore, that the exigent circumstances which existed at the time the warrant was to be executed justified any noncompliance with the "knock and announce" rule which may have occurred.

## VI

The defendant next claims that the trial court erred in instructing the jury on alternative theories of robbery, under General Statutes § 53a-133, and larceny, under General Statutes § 53a-119, when there was no evidence or insufficient evidence to support those theories. We find no error.

In accordance with General Statutes § 53a-133, the trial court instructed the jury that "[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or engage in other conduct which aids in the commission of a larceny."

The defendant claims that there was no evidence which would permit the jury to conclude that force was used to compel the victims "to deliver up" the property. Therefore, the defendant argues, the trial court erred in instructing the jury that "delivering up" the property was a possible element of the crime for which he was charged.

Donna Sousa, Donald Couture's wife, testified that when the defendants arrived at the Purolator Garage they threw a cinder block through the window and told the guards to "freeze." After the guards did not comply with this request the defendants began to shoot. The jury could reasonably have found that by throwing the cinder block through the window and ordering the victims to "freeze" the defendants were attempting to compel the victims to "deliver up" the property. Therefore, there was sufficient evidence which would let the jury reasonably conclude that the victims were forced to deliver up the property.

The defendant further claims that the trial court erred in its instruction to the jury on larceny as an element of robbery and thus an element of felony murder. The trial court instructed that "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. The defendant claims that there was no evidence to support either "obtaining" or "withholding" which, he argues, are analytically distinct from a "taking." We disagree.

In the context of this case the three words "taking," "obtaining," and "withholding" are inseparable. Certainly, as the defendant concedes, there was evidence of a "taking." We cannot distinguish a difference between the defendant's "taking" of Purolator's property, and his "obtaining" that property. Furthermore, there is sufficient evidence that the defendant, thereafter, "withheld" that property when it was hidden in Couture's basement. Therefore, we find no error.

## VII

The defendant next claims that he was denied his constitutional right to confront the witnesses against him.

U.S. Const., amend. VI. He claims that the trial court erred in admitting into evidence hearsay statements made by the codefendant, Donald Couture. We disagree.

At trial, Sousa testified that immediately after the robbery and murders, Couture and the defendant returned to the Couture home as previously planned. Sousa testified that before the defendants began unloading the truck, Couture entered the house and told Sousa about the shootings. Couture stated that one of the guards had been on his knees begging for mercy, and they had shot him.

The defendant claims that Couture's statement about the begging victim was inadmissible hearsay and therefore violated his constitutional right of confrontation. *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). Although Couture's out-of-court statement was hearsay, it is well established that a coconspirator's statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause. *State* v. *Spencer,* 198 Conn. 506, 513, 503 A.2d 1165 (1986); *State* v. *Vessichio,* 197 Conn. 644, 654–55, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

Here, the evidence reveals that the defendant and Couture conspired to steal the money, transport the money to the Couture home, and store the money in the basement. The statement in question was made before the defendants began unloading the truck and, thus, before the conspiracy was completed. Furthermore, Couture indicated that he wanted to tell Sousa about the shootings before she heard about it on the news. We view this statement as relevant to the furtherance of the conspiracy. Couture's statement was

made to lessen any emotional trauma the killings would cause Sousa, whose house was being used to hide the stolen property and whose further cooperation was obviously necessary. The clear implication is that this statement helped to maintain the cohesiveness of the conspiracy thereby furthering its purpose.

We conclude that Couture's statement, as testified to by Sousa, was properly admitted as an exception to the hearsay rule and, therefore, did not violate the defendant's constitutional right to confrontation. See *State* v. *Spencer,* supra.

## VIII

We have examined the defendant's further claims that the trial court erred in: refusing to give the defendant's requested instruction on intoxication and lesser included offenses; refusing to allow the defendant to present evidence of a potential third party culprit; and imposing three separate punishments for three felony murder convictions based on the same underlying felony. We have also examined his claims that: his second trial was barred by double jeopardy; the grand jury indictment was improper because of the underrepresentation of hispanics on the grand juries in the Waterbury judicial district and the presence and participation of unauthorized persons in the grand jury room during those proceedings; he was denied his right to a fair trial because of prosecutorial misconduct in the state's closing summation; and he was denied his right to a speedy trial. We find all of them to be without merit.

There is no error.

In this opinion PETERS, C. J., SHEA and CALLAHAN, Js., concurred.

HEALEY, J., concurred in the result.