******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'AURIA, J., with whom McDONALD, J., joins, concurring. Because I agree with the majority that, in the present case, the lack of a jury instruction pursuant to *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), was harmless, I concur in the result. I do not agree, however, with the standard that the majority adopts for determining whether any error was harmless under these circumstances. The majority determines that, when a petitioner seeking habeas relief establishes a *Salamon* error, the habeas court must assess the harm of that error according to the legal standard that the United States Supreme Court articulated in *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (new trial mandated if instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks omitted)), rather than the more petitioner friendly standard adopted in *Neder* v. *United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (new trial required if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the [instructional] error"). I disagree with the majority opinion for two reasons. First, because the petitioner, Mark Banks, cannot prevail under either standard, I do not believe that this court needs to—or should—decide which standard applies, especially as it is unclear how many, if any, future cases this standard will apply to. Second, I believe that *Neder* is the proper standard. Accordingly, I respectfully concur.

I

In *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 136 A.3d 596 (2016), we concluded that, because the petitioner would prevail under either the *Brecht* or *Neder* standards for determining the harmlessness of a *Salamon* violation on collateral review, we did not need to "enter the fray" and decide whether to adopt the more state friendly *Brecht* standard "and the uncertainties that accompany it." Id., 83. In the present case, I agree with the majority that the petitioner would *not* prevail under either standard,[1] and, in my view, the majority's decision to apply the *Brecht* standard is dictum. I therefore do not believe that this late in the day for *Salamon* claims there is any greater justification to "enter the fray" than there was five years ago in *Hinds*. In fact, I believe there is less.

It has been more than one decade since this court released its decision in *Salamon* and then held that the new rule in *Salamon* applies retroactively to collateral attacks on final judgments in *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 769, 12 A.3d 817 (2011) (plurality opinion). In *Luurtsema*,[2] in holding

that *Salamon* would apply retroactively to those litigants whose direct appeals already had been decided at the time of *Salamon*, we explained that, "[o]f the 1.5 percent of . . . inmates incarcerated for kidnapping or unlawful restraint, one can reasonably assume that only a small subset will fall within the ambit of *Salamon*." Id. Although the parties have not provided any data in the present case on the number of potential *Salamon* claims that remain for cases that already have become final, there is a real possibility that the new standard that the majority adopts might never be applied to another case.[3] I am not suggesting that, when this court's holding likely will not affect many cases, we should not resolve the issue. Rather, I believe that, when addressing the issue is not necessary to resolve the case, we should refrain from altering the applicable standard at the eleventh hour. Thus, as we are not required to decide this issue to adjudicate the petitioner's claims in the present case or the claims asserted in the companion case, *Bell* v. *Commissioner of Correction*, 339 Conn. 79,     A.3d     (2021), also decided today, I do not believe we should.

## II

The majority having determined to reach the issue, I also disagree with its resolution of the issue. The majority properly notes that only twice have we had occasion to apply *Salamon* in the habeas context and contends that, in these two cases, we did not envision that such claims would be evaluated under the more petitioner friendly *Neder* standard. I disagree. I believe this court's retroactive application of the *Salamon* rule to both pending and final cases has strongly suggested that the *Neder* standard applies to all *Salamon* violations. Certainly, that has been the understanding of our Appellate Court, our habeas courts, and the respondent, the Commissioner of Correction. Further, unlike the majority, I also find there to be countervailing policy concerns that militate in favor of continuing to apply the *Neder* standard for claims such as those of the petitioner.

## A

In *Salamon*, this court overruled our long-standing interpretation of this state's kidnapping statutes and held that, when a criminal defendant is charged with kidnapping in conjunction with another underlying crime, such as rape or assault, the trial court must instruct the jury that it cannot find the defendant guilty of kidnapping if the restraint imposed on the victim was merely incidental to that underlying crime. *State* v. *Salamon*, supra, 287 Conn. 550. In so holding, we relied heavily on "the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes . . . ." Id., 542. A prominent concern at the time of the enactment of our

current kidnapping statutes was prosecutorial over-charging: "Beginning in the 1950s . . . questions surfaced about the propriety of [our] expansively worded kidnapping statutes. In particular, concerns were expressed that the newly adopted kidnapping statutes permitted the imposition of extremely severe sanctions for a broad and ill defined range of behavior, including relatively trivial types of restraint. . . . [E]xamples of abusive prosecution for kidnapping [were] common, [so the legislature sought] to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to serious injustice . . . ." (Citations omitted; internal quotation marks omitted.) Id., 538–39. We noted in *Salamon* that, in drafting our current kidnapping statute, the legislature "intended to create a new statutory scheme that recognized varying degrees of unlawful restrictions on a victim's liberty by drawing a distinction between a 'restraint,' which, standing alone, comprises the crime of unlawful restraint, and an 'abduction,' which comprises the crime of kidnapping," thereby intending "to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim." Id., 541–42. Nevertheless, in interpreting our kidnapping statutes prior to *Salamon*, this court failed to recognize this exclusion. Id., 543. "Unfortunately, that interpretation has afforded prosecutors virtually unbridled discretion to charge the same conduct either as a kidnapping or as an unlawful restraint despite the significant differences in the penalties that attach to those offenses. Similarly, our prior construction of the kidnapping statutes has permitted prosecutors—indeed, it has encouraged them—to include a kidnapping charge in any case involving a sexual assault or robbery." Id., 543–44.

Subsequently, but with limited analysis, this court in *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008) (overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008)),[4] superseded in part after reconsideration en banc, 291 Conn. 574, 969 A.2d 710 (2009), applied the new rule in *Salamon* retroactively to direct appeals pending at the time *Salamon* was decided. *State* v. *Sanseverino*, supra, 287 Conn. 620 n.11. Not until approximately three years after *Salamon* did this court address its applicability to collateral attacks on final judgments, although we did not have to address the proper standard for evaluating harm because the retroactivity issue came to this court by way of reserved question.

In *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740, we agreed with the petitioner that, "as a matter of state common law, *Salamon* should be afforded fully retroactive effect," including as to collat-

eral attacks on final judgments by way of habeas petitions. Id., 751 (plurality opinion). We explained that, "[a]s a matter of federal constitutional law, each jurisdiction is free to decide whether, and under what circumstances, it will afford habeas petitioners the retroactive benefit of new judicial interpretations of the substantive criminal law issued after their convictions became final." Id., 754 (plurality opinion). We recognized that, "in the federal system, the United States Supreme Court has adopted a per se rule that, when federal courts reinterpret congressional legislation, new interpretations of substantive criminal statutes must be applied retroactively on collateral review." Id., 754–55 (plurality opinion).

Our own determination of retroactivity in *Luurtsema* focused on the purpose of habeas relief: "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. . . . To mount a successful collateral attack on his conviction, a prisoner must demonstrate . . . a fundamental unfairness or miscarriage of justice . . . ." (Internal quotation marks omitted.) Id., 758 (plurality opinion). We reasoned that, "regardless of whether one reads *Salamon* to be a change or clarification of the law, the court in *Salamon* saw itself as discerning the original legislative meaning of [General Statutes] § 53a-92 (a) (2) (A). . . . If the legislature never intended an assault to constitute kidnapping, without evidence of the perpetrator's independent intent to restrain the victim, then the petitioner . . . stands convicted of a crime that he arguably did not commit. This conclusion raises serious due process concerns. It is well settled that due process requires the state to prove every element of the offense charged beyond a reasonable doubt. . . . Under our system of justice, considerations of finality simply cannot justify the continued incarceration of someone who did not commit the crime of which he stands convicted." (Citations omitted; internal quotation marks omitted.) Id., 758–59 (plurality opinion). Thus, although we declined the petitioner's invitation to adopt a per se rule in favor of full retroactivity, we concluded that, "when an appellate court provides a new interpretation of a substantive criminal statute, an inmate convicted under a prior, more expansive reading of the statute presumptively will be entitled to the benefit of the new interpretation on collateral attack." Id., 760 (plurality opinion).

This court in *Luurtsema* proceeded at some length to reject the "five rationales either for adopting a per se rule against retroactive relief or for denying relief in [that] case: (1) the fact that law enforcement relied on the old interpretation of the kidnapping statutes while trying the petitioner; (2) the fact that the retroactive application of *Salamon* has no deterrent value or remedial purpose; (3) the fear that our courts will be 'flooded' with habeas petitions from other inmates con-

victed [of kidnapping]; (4) the difficulty of retrying such cases where significant time has elapsed since conviction; and, perhaps most importantly (5) the concern that victims will be retraumatized by again having to testify and endure another round of judicial proceedings." Id., 765 (plurality opinion). In response to these arguments, we explained that "many of the concerns raised by the state in the habeas context apply with equal force to direct appeals, in which it is undisputed that appellants receive the benefit of retroactive application of judicial decisions that narrow the scope of liability under a criminal statute." Id., 766 (plurality opinion).[5] Unlike the majority, I believe that this court's rejection of the state's arguments in *Luurtsema* supports the *Neder* standard, not the *Brecht* standard.

First, although the *Neder* standard was not at issue in *Luurtsema*, we signaled that it applies on collateral review. It is not so, as the majority suggests, that "we did not envision that such claims would be evaluated under the stringent *Neder* standard" because "we thought that many *Salamon* cases could be disposed of summarily on the ground of harmless error . . . ." In *Luurtsema*, we emphasized that the state's concerns over applying *Salamon* retroactively to cases on collateral review applied equally to our earlier determination to apply *Salamon* retroactively to cases pending on direct appeal when we decided *Sanseverino*. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 769–70 (plurality opinion). We went on to indicate that error arising from the lack of a *Salamon* instruction in cases brought before the court on collateral review would be reviewed for harm; see id. (plurality opinion); citing to *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009), which had applied the *Neder* harmless error standard.

Subsequently, in *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 56, this court conceded that, by including this citation to *Hampton*, we had "indicated that the proper standard to make such an assessment would be the harmless error standard applied on direct appeal," i.e., *Neder*. See id., 77. Thus, to the extent that this court in *Luurtsema* "strongly suggested" anything about the proper harmless error standard to apply on collateral review, it has strongly suggested the *Neder* standard.

In *Hinds*, this court was asked to address how the retroactivity of *Salamon* on collateral review interacted with our procedural default rule.[6] Id., 60. We concluded that "[the] retroactivity decision [in *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740] compels the conclusion that challenges to kidnapping instructions in criminal proceedings rendered final before *Salamon* are not subject to the procedural default rule." *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 61. In reaching this conclusion, this court examined

its reasoning in *Luurtsema* for applying the rule in *Salamon* retroactively and determined that this reasoning was inconsistent with the procedural default rule: "[A]pplication of the procedural default bar to protect finality of judgments seems inconsistent with the reasoning in [*Luurtsema*] that the interests of finality must give way to the demands of liberty and a proper respect for the intent of the legislative branch." (Internal quotation marks omitted.) Id., 73.

Particularly significant to the issue at hand, we specifically noted in *Hinds* that, in *Luurtsema*, we did not apply any heightened standard, such as the procedural default doctrine's heightened prejudice standard, to keep any floodgates from swinging open.[7] Id., 74–76. Rather, we recognized that, in *Luurtsema*, we cited the *Neder* harmless error standard for direct appeal. See id., 75. Thus, this court already has rejected the application of a heightened prejudice standard to *Salamon* claims on collateral review. In *Hinds*, this court then went on to discuss the applicable standard for determining harm. Again, we recognized that, "[i]n [*Luurtsema*], the court *indicated* that the proper standard to make such an assessment would be the harmless error standard applied on direct appeal [by citing to *Hampton*]." (Emphasis added.) Id., 77.

Only after deciding that "the petitioner [in *Hinds* was] entitled to relief under our established harmless error standard"; id., 81; did we "note that this court has not had the occasion to consider whether, even in the absence of procedural default, a more stringent standard of harm should apply in collateral proceedings," such as the *Brecht* standard.[8] Id. Nevertheless, because the dissenting justices' conclusion in *Hinds* that the petitioner was "not entitled to a new trial due to his failure to establish the actual prejudice to overcome a procedurally defaulted claim appear[ed] to signal a retreat from our holdings in *Salamon* and [*Luurtsema*], we . . . explain[ed] why the petitioner [in *Hinds*] would prevail even under the more stringent standard" the dissenting justices applied. Id., 83.

Although we decided *Luurtsema* on a reservation for advice and a stipulation of facts, and our language in *Hinds* regarding *Brecht* might arguably be considered dictum,[9] we noted in *Hinds* that *Neder* was "the standard that was applied by the habeas court in [that] case and ha[d] been applied in several other cases. See, e.g., *Eric M.* v. *Commissioner of Correction*, 153 Conn. App. 837, 845, 108 A.3d 1128 (2014), cert. denied, 315 Conn. 915, 106 A.3d 308 (2015); *St. John* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-11-4003987-S (March 7, 2013); see also *Epps* v. *Commissioner of Correction*, 153 Conn. App. 729, 738, 740, 104 A.3d 760 (2014) (determining that petitioner must overcome procedural default but applying direct appeal harmless error standard in prejudice analysis); *Nogueira*

v. *Warden,* Superior Court, judicial district of Tolland, Docket No. CV-14-4006033-S (June 10, 2015) (same); *Smith* v. *Warden,* Superior Court, judicial district of Tolland, Docket No. CV-08-4002747-S (September 13, 2011) (same)." *Hinds* v. *Commissioner of Correction,* supra, 321 Conn. 77. *Hinds* does not indicate that a contrary standard might apply. Although limited, this court's prior case law applying the rule in *Salamon* retroactively on collateral review suggests that the *Neder* standard is the proper standard for determining harm, although the parties did not explicitly raise, and this court did not explicitly address, this issue.

The majority's contention that our prior case law "strongly suggests" the adoption of the *Brecht* standard is belied by the plain language of these cases and suggests that these cases have been misunderstood by both our habeas courts and the Appellate Court, which, consistent with the signals this court gave in *Hinds,* have uniformly applied the *Neder* standard to *Salamon* violations raised in a collateral proceeding. See *Palmer* v. *Commissioner of Correction,* 202 Conn. App. 902, 242 A.3d 1084 (2021) (per curiam affirmance of judgment of habeas court, which applied *Neder* harmless error standard to *Salamon* claim); *John B.* v. *Commissioner of Correction,* 194 Conn. App. 767, 774, 222 A.3d 984 (2019) (applying *Neder* harmless error standard to *Salamon* claim raised in habeas appeal, citing to *Hinds* as support), cert. denied, 334 Conn. 919, 222 A.3d 513 (2020); *Britton* v. *Commissioner of Correction,* 185 Conn. App. 388, 400, 197 A.3d 895 (2018) (same), petition for cert. filed (Conn. November 26, 2018) (No. 180266); *Pereira* v. *Commissioner of Correction,* 176 Conn. App. 762, 768, 171 A.3d 105 (same), cert. denied, 327 Conn. 984, 175 A.3d 43 (2017); *White* v. *Commissioner of Correction,* 170 Conn. App. 415, 427, 154 A.3d 1054 (2017) (same); *Nogueira* v. *Commissioner of Correction,* 168 Conn. App. 803, 814, 149 A.3d 983 (same), cert. denied, 323 Conn. 949, 169 A.3d 792 (2016); *Farmer* v. *Commissioner of Correction,* 165 Conn. App. 455, 460, 139 A.3d 767 (same), cert. denied, 323 Conn. 905, 150 A.3d 685 (2016); *Coltherst* v. *Commissioner of Correction,* Docket No. CV-15-4007268-S, 2019 WL 7425147, *10–12 (Conn. Super. November 19, 2019) (applying *Neder* standard and finding lack of *Salamon* instruction harmless). I do not mean to suggest that this court should not correct errors by lower courts or not clarify ambiguous case law. But I do not believe that this is what the majority is doing in its analysis. Rather, the majority has decided for policy reasons to reverse course and to adopt a standard inconsistent with our prior case law.

In fact, even as late as 2014, in *Epps* v. *Commissioner of Correction,* 153 Conn. App. 729, 738, 740, 104 A.3d 760 (2014), appeal dismissed, 327 Conn. 482, 175 A.3d 558 (2018), the respondent was arguing in habeas cases involving the failure to give a *Salamon* instruction that

the *Neder* standard for harmless error applied, a standard he did not prevail on in the Appellate Court in *Epps*. Only before this court in *Epps* did the respondent begin to argue that the *Brecht* standard should govern.[10] Since the Appellate Court decided *Epps*, the respondent has relied on the *Neder* standard in multiple cases before the Appellate Court in which a *Salamon* violation was raised, not even mentioning *Brecht* in appellate briefs. See, e.g., *Nogueira* v. *Commissioner of Correction*, supra, 168 Conn. App. 814; *Farmer* v. *Commissioner of Correction*, supra, 165 Conn. App. 460. From my research, it appears that the first habeas case in which the respondent challenged the *Neder* standard before the Appellate Court was *White* v. *Commissioner of Correction*, supra, 170 Conn. App. 427, which was not decided until 2017. Thus, not only the courts, but also the respondent has interpreted *Hinds* as applying, if not adopting, the *Neder* standard, which is reasonable given our analysis in that case.

B

Having made clear in *Luurtsema* that the retroactivity of new judicial interpretations of substantive criminal law on collateral review is a "matter of state common law," and that we are not bound by federal law, the determination of the appropriate standard to apply for analyzing harm is likewise a matter of state common law and a policy question for this court to determine. I do not read the majority opinion to suggest otherwise. See, e.g., *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 255, 819 A.2d 773 (2003) (determination of proper burden of proof based on certain policy considerations); *Albert Mendel & Son, Inc.* v. *Krogh*, 4 Conn. App. 117, 124, 492 A.2d 536 (1985) ("The proper allocation of the burden of proof may be distilled to a question of policy and fairness based on experience in different situations. . . . A number of variables are considered in determining where the burden properly lies. One consideration is which party has readier access to knowledge about the fact in question." (Citations omitted; footnote omitted.)). I would come to a different policy determination than the majority does.

*Brecht* concerned a federal court's collateral review of a state court criminal judgment pursuant to 28 U.S.C. § 2254. See *Brecht* v. *Abrahamson*, supra, 507 U.S. 626. The court in *Brecht* and in later cases emphasized that the choice to apply a more government friendly harmlessness standard was driven in large part by concerns unique to federal habeas review of state court judgments—namely, that the application of a petitioner friendly standard as in *Neder* would (1) invade state sovereignty over criminal matters (i.e., federalism and comity), (2) undercut the historic limitation of habeas relief to those " 'grievously wronged,' " (3) infringe on a state's interest in finality, and (4) impose significant

societal costs. Id., 633–38; see also *Fry* v. *Pliler*, 551 U.S. 112, 117, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007). Notwithstanding significant differences between federal habeas review of state criminal judgments and the situation we confront upon a finding of a *Salamon* violation, the majority's own rationale in opting for the *Brecht* standard is still driven by these policies in significant part. This is where I disagree most pointedly with the court's opinion.

First,[11] unlike the majority, I see no need for this standard to be "consistent with how we handle other claims of error in habeas actions." A *Salamon* violation is unlike many other claims of error in habeas actions: it is a determination that the state, in prosecuting a defendant, was unconstitutionally relieved of proving an essential element of the crime of kidnapping. In both *Salamon* and *Luurtsema*, this court indicated that a reinterpretation of the language of our kidnapping statute was long overdue and that the legislature never intended to criminalize conduct that this court had erroneously interpreted the statute to capture, i.e., a restraint of a victim merely incidental to the commission of a separate crime. For nearly one-half century, interpreting the statute broadly had led to prosecutors overcharging and juries finding defendants guilty on allegations the legislature never intended to punish.

A *Salamon* claim is traditionally the kind of claim that should have been raised on direct appeal and is not permitted to be raised in a habeas action unless the petitioner can satisfy the procedural default rule. See *Jackson* v. *Commissioner of Correction*, 227 Conn. 124, 131–32, 629 A.2d 413 (1993). Similar claims about the proper interpretation of our kidnapping statutes had been made and rejected several times in the thirty years preceding *Salamon*. See *State* v. *Salamon*, supra, 287 Conn. 531 ("Since 1977, we have had numerous opportunities to examine the scope of the kidnapping statutes, generally in response to a claim that the crime of kidnapping was not intended to apply to a restraint that was merely incidental to the commission of another crime. See, e.g., *State* v. *Luurtsema*, [262 Conn. 179, 200, 811 A.2d 223 (2002)]; *State* v. *Wilcox*, [254 Conn. 441, 465–66, 758 A.2d 824 (2000)]; *State* v. *Amarillo*, [198 Conn. 285, 304–306, 503 A.2d 146 (1986)]; *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983); *State* v. *Johnson*, 185 Conn. 163, 177–78, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Briggs*, 179 Conn. 328, 338–39, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *DeWitt*, 177 Conn. 637, 640–41, 419 A.2d 861 (1979); *State* v. *Lee*, [177 Conn. 335, 342–43, 417 A.2d 354 (1979)]; *State* v. *Chetcuti*, [173 Conn. 165, 170, 377 A.2d 263 (1977)].") Bringing such an argument to the court was not for the fainthearted— as it bordered on being frivolous—and at least could be criticized as "depreciat[ing]" other claims. (Internal

quotation marks omitted.) *State* v. *Pelletier*, 209 Conn. 564, 567, 552 A.2d 805 (1989). Until one day, this court agreed.

For reasons of fairness, as discussed previously, this court in *Luurtsema* and *Hinds* held that *Salamon* claims raised for the first time in a habeas action are unique—the byproduct of the retroactivity exception to the general rule against these kinds of claims being raised on collateral review, along with the procedural default rule being forgiven. For this reason, I do not see why there is any need for us to apply a standard consistent with that employed in other habeas cases. Rather, if this court is trying to create consistency, the same standard should be used for *Salamon* claims both on direct review and collateral review, as there is no real distinction between the claims other than the temporal relation of the case to our decision in *Salamon*, which is merely a matter of good or bad fortune.

Further, this court, our Appellate Court, and habeas courts consistently have applied the *Neder* standard to *Salamon* claims on collateral review. See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 77; see also id. (citing cases). So, not only would the petitioner in this case be afforded less protection than defendants whose cases were pending or were initiated after *Salamon*, but he will be afforded less protection than other habeas petitioners who have raised *Salamon* claims on collateral review in the years since *Luurtsema* and *Hinds* but prior to our decision in the present case. I am not suggesting that these lower court cases bind our analysis. I am suggesting that these cases demonstrate the unfairness of adopting the *Brecht* standard at this late date, a clearly appropriate policy consideration in determining whether this court should alter the applicable standard.

The majority defends this arbitrariness by rationalizing that "the somewhat scattershot nature of harmless error jurisprudence, with standards varying by the type of error at issue, the stage of review, and the jurisdiction in which the claim is reviewed, means that whichever standard we apply to *Salamon* errors in state habeas cases may appear to be unfair or incongruous from one vantage or another." Choosing the *Brecht* standard over the *Neder* standard seems to me to be little more than an attempt to counterbalance this court's determination to apply *Salamon* retroactively to collateral challenges and to forgive the procedural default rule by giving the respondent a break on the harmlessness standard. The majority reasons: "It certainly will not seem unjust from the respondent's standpoint to require a showing that there is some reasonable likelihood that the failure to give the jury a *Salamon* instruction had a substantial and injurious effect or influence on the outcome before requiring the state to retry the petitioner for crimes that were committed more than twenty-five years ago."

In my view, this reasoning misses the mark and loosens *Luurtsema* and *Hinds* from their jurisprudential moorings. The twenty-five years since the date of the petitioner's trial should of course play no role in this analysis but merely provide color. To the extent that the majority's rationale reflects a concern about finality, this court has already indicated that that interest "must give way to the demands of liberty and a proper respect for the intent of the legislative branch." (Internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 73; see also *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 759 (plurality opinion) ("considerations of finality simply cannot justify the continued incarceration of someone who did not commit the crime of which he stands convicted"). It is not the petitioner's fault that this court awakened late to the fact that the legislature never intended for the present language of our kidnapping statute to extend as broadly as it had been construed, more than one decade after his criminal trial and eight years after his direct appeal became final. Although the majority is correct that it is not the *state's* fault, either, that this court reinterpreted our kidnapping statutes when it did, the state surely benefited more from a jurisprudential regime that relieved it of having to prove an essential element than did those defendants accused of the kidnappings.[12]

In holding that *Salamon* applies retroactively to cases that are already final, this court recognized that older cases may need to be retried, accepting this as a necessary consequence of correcting injustices that had occurred as a result of prosecutorial overcharging and this court's failure to construe our statutes properly so as to curb that practice. See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 766–67, 772–73 (plurality opinion). The fact that the state must now deal with these consequences should not come at the expense of the petitioner, especially when limiting the petitioner's protection out of fairness to the state would contradict the purpose of our holdings in *Luurtsema* and *Hinds*. Moreover, this consequence is not unique to collateral review, as this court noted in *Luurtsema* when it recognized that cases pending on direct appeal at the time of *Salamon* might also require retrial years after the initial criminal trial. Id., 766–67 (plurality opinion).

There is perhaps no better way to summarize my concerns regarding the fairness of the court's rationale in the present case than that of the sage author of the majority opinion (whose collegiality and guidance I already miss): "[T]o apply *Brecht* in the present case would be unfair to the petitioner and to others similarly situated. That this court opted to revisit and revise our interpretation of the state's kidnapping laws following his conviction is no more the fault of the petitioner

than of the state. Although would-be offenders were on notice in 1995 that they could be charged with kidnapping solely on the basis of the restraint inherent in robberies or assaults, they, like the state, did not have any reason to try their cases with the *Salamon* distinction in mind. Moreover, it may seem discrepant to assess the impact of the instructional error according to the more forgiving *Brecht* standard when, if we had decided *Salamon* one decade earlier, while the petitioner's direct appeal was pending, the state would have borne the burden of proving that the error was harmless beyond a reasonable doubt."

## III

Which brings me back to my original point: Why are we deciding this issue at this late date? By declining to "enter the fray" and answer this question; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 83; we would not, in my view, be "shrink[ing] from our duty" any more than this court already has to date in declining to answer this unique question in *Hinds*. Footnote 6 of the majority opinion. This court, the Appellate Court, and habeas courts, consistent with the signals this court gave in *Hinds*, have been applying the *Neder* standard to *Salamon* claims raised on collateral review, and both petitioners and the respondent have managed to prevail under that standard. The parties have provided us with no data regarding how many potential cases remain to which the *Brecht* standard would apply, especially as it appears that some cases have been resolved by agreement. See footnote 3 of this opinion. The number cannot be infinite. Most evidence points to the fact that it is likely a very small number, and obviously shrinking. It is of course true that a lower court cannot bind this court and that courts of last resort, such as the United States Supreme Court, may allow issues to "percolate" before deciding them. But it must be rare for a court to allow an issue to percolate to the point of virtual extinction and to decide it only after giving strong signals as to the correct outcome, and after the lower courts have uniformly decided the issue that way.

Given that the outcome of this appeal would be the same regardless of the standard applied, and that the majority's holding will possibly have little to no effect going forward, I believe it is imprudent to address and decide this issue. In my view, if there are in fact any cases left in this shrinking universe to which today's announcement will apply, it is unfortunate that the court is now changing its mind about the standard that will govern harmlessness. It is also ironic given that the fallout from *Salamon* itself has concerned the application of retroactivity rules fairly to a change of this court's mind.

Policy considerations support this view. The petitioner in the present case and any petitioners going forward, assuming there are any, will receive less pro-

tection than those who happened to have their habeas petitions decided before today's decision. This appears to be a matter of pure chance and perpetuates the unfairness that *Salamon* and its progeny have attempted to correct. Every petitioner to have brought a collateral *Salamon* challenge has had appointed counsel. We have no understanding about how the public defender's office prioritizes inmate cases or whether and to what extent inmates might understand that they had a *Salamon* claim. Finally, I am concerned that, by needlessly "enter[ing] the fray"; *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 83; regarding which standard to apply, this court might not realize how its decision to adopt the *Brecht* standard in the context of a *Salamon* claim might have possible ramifications in contexts we have yet to anticipate.

Accordingly, I respectfully concur.

[1] I agree fully with then Judge Keller's well reasoned dissenting opinion in the Appellate Court that the absence of a *Salamon* instruction was harmless beyond a reasonable doubt under the *Neder* standard. *Banks* v. *Commissioner of Correction*, 184 Conn. App. 101, 132–33, 194 A.3d 780 (2018) (*Keller, J.*, dissenting). The majority likewise agrees with Judge Keller that "the petitioner could not prevail on his claim even, if we agreed with him that the respondent [the Commissioner of Correction] was required to establish harmlessness beyond a reasonable doubt." Footnote 16 of the majority opinion.

[2] I note that *Luurtsema* was a plurality decision. Nevertheless, the plurality's analysis in that case belies the majority's contention that this case supports the adoption of the *Brecht* standard. Additionally, the court in *Hinds*, which was a majority decision, relied heavily on *Luurtsema*, treating it as controlling law, and, thus, I do the same. See *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 61 ("we conclude that [the] retroactivity decision [in *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 740] *compels* the conclusion that challenges to kidnapping instructions in criminal proceedings rendered final before *Salamon* are not subject to the procedural default rule" (emphasis added)).

[3] In *Epps* v. *Commissioner of Correction*, 327 Conn. 482, 175 A.3d 558 (2018), the petitioner's counsel represented in the petitioner's brief: "There are no records of cases by type of claim kept by the court or public defender, but a repeated canvass of appointed counsel turned up only three cases with potential to present *Luurtsema-Salamon* issues for decision by the habeas court. Counsel also have resolved by agreement a number of *Salamon* habeas cases without necessitating trial of the case." *Epps* v. *Commissioner of Correction*, Conn. Supreme Court Briefs & Appendices, November Term, 2017, Petitioner's Brief p. 25 n.23. Counsel for the respondent, the Commissioner of Correction, in *Epps* did not contradict this representation. Our own databases show no present cases pending in our court or the Appellate Court other than *Britton* v. *Commissioner of Correction*, 185 Conn. App. 388, 197 A.3d 895 (2018) (*Salamon* violation was harmless beyond reasonable doubt under *Neder*), petition for cert. filed (Conn. November 26, 2018) (No. 180266). The parties have provided this court with no data regarding how many cases our decision in this case will affect. With perhaps the exception of *Britton*, the present case and the companion case, *Bell* v. *Commissioner of Correction*, 339 Conn. 79,     A.3d     (2021), which we also decided today, might very well be the only cases in which this new standard will be applied. Moreover, as I discuss in greater detail in part II of this opinion, both the Appellate Court and habeas courts consistently have relied on *Luurtsema* and *Hinds* as holding that the *Neder* standard is the proper standard, thereby not only belying the majority's contention that these cases "strongly [suggest]" that the *Brecht* standard is more appropriate, but also showing that all but a very few remaining *Salamon* claims raised on collateral review will be subject to the *Brecht* standard.

[4] In *DeJesus*, this court overruled *Sanseverino* to the extent that *Sanseverino* held that a judgment of acquittal, rather than a new trial, could serve as a proper remedy for a *Salamon* violation.

[5] We pointed out in *Luurtsema* that *State* v. *Sanseverino*, supra, 287 Conn.

620 n.11, provided an instructive case in point: "The crimes charged in [*Sanseverino*] commenced in June or July of 1998 . . . a mere two to three months after the incident for which the petitioner in [*Luurtsema*] was convicted. Whereas the petitioner's conviction became final in 2003, however, *Sanseverino* was still under review when we decided *Salamon* in 2008. Any concerns regarding prosecutorial reliance and the burdens associated with retrying a ten year old crime apply to *Sanseverino* no less than to [*Luurtsema*]." (Citation omitted.) *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 766–67 (plurality opinion).

Also, more specifically as to the respondent's third rationale regarding the opening of the floodgates, this court acknowledged that "[t]here is little doubt that some petitioners will come forward contending that they are serving substantially longer sentences than are prescribed by the [Penal] [C]ode, as properly construed. In [his] brief, however, the [respondent] has identified only five such petitions that have been filed in the more than two years since we decided *Salamon* and *Sanseverino*. At oral argument before this court, the [respondent] declined to provide additional information as to the number of present inmates who might have a colorable claim under *Salamon*. Of the 1.5 percent of . . . inmates incarcerated for kidnapping or unlawful restraint, one can reasonably assume that only a small subset will fall within the ambit of *Salamon*. Of those, we expect that courts will be able to dispose summarily of many cases where it is sufficiently clear from the evidence presented at trial that the petitioner was guilty of kidnapping, as properly defined, that any error arising from a failure to instruct the jury in accordance with the rule in *Salamon* was harmless. See, e.g., *State* v. *Hampton*, 293 Conn. 435, 463–64, 978 A.2d 1089 (2009). Likewise, we doubt the [respondent] will expend the resources to retry cases [when] it is reasonably clear that a petitioner could not have been convicted of kidnapping under the correct interpretation of the statute." (Footnote omitted.) *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 769–70 (plurality opinion).

[6] "[W]e have adopted the procedural default standard prescribed in *Wainwright* v. *Sykes*, [433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977)]. . . . Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . ." (Citations omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 71.

[7] Specifically, in reaching our conclusion in *Hinds*, we explained: "Other aspects of the court's reasoning [in *Luurtsema* also] bolster our conclusion that this holding was not intended to afford relief to only those petitioners who could avoid or overcome the procedural default bar. The court in [*Luurtsema*] extensively considered limitations on its retroactivity ruling, but did not cite procedural default as such a limitation. Availability of that doctrine and its heightened prejudice standard would have been a natural response to the [respondent's] floodgates argument had the court intended the doctrine to apply. Instead, the court responded [by explaining that] . . . one can reasonably assume that only a small subset will fall within the ambit of *Salamon*. . . . One particular aspect of this response is telling. The court cited the harmless error standard for direct appeal—a standard wholly inconsistent with the actual prejudice standard for procedurally defaulted claims—as the limiting mechanism for colorable but ultimately nonmeritorious claims." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 74–75.

[8] "In *Brecht* v. *Abrahamson*, supra, 507 U.S. 623, a bare majority of the United States Supreme Court departed from its history of more than 200 years of parity between direct appeals and habeas corpus proceedings for constitutional claims. . . . Citing federalism, comity, finality and other prudential considerations, the court determined that habeas proceedings require a standard that imposes a less stringent burden on the state when the constitutional error is not structural. . . . *Brecht* and its progeny have raised numerous questions as to the precise standard to be applied in determining whether a particular type of error is harmless, and what degree of certainty as to whether that standard has been met." (Citations omitted.) *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 81–82.

[9] It is at *best* arguable that *Hinds*' use of the *Neder* standard was dictum. In fact, because nothing in the majority's opinion in *Hinds* suggests that *Brecht* is the proper standard, and because the majority in *Hinds* explained that it analyzed the petitioner's claim in that case under the *Brecht* standard

only to respond to the arguments of the dissenting justices, it is more accurate to say that any discussion of the *Brecht* standard was dictum.

[10] After this court released its decision in *Hinds*, in *Epps* v. *Commissioner of Correction*, 327 Conn. 482, 175 A.3d 558 (2018), we permitted the respondent, whose petition for certification to appeal was pending at the time, "to file an amended petition for certification. Over the petitioner's objection, this court granted the respondent's amended petition, which raised the question 'left unresolved' by *Hinds* regarding the proper measurement of harm in collateral proceedings like the . . . one [in *Epps*] and the question of whether, irrespective of which standard applied, harm had been established in the petitioner's criminal case." Id., 484. This court, however, subsequently dismissed the appeal on the ground that certification was improvidently granted because "[t]he respondent had squarely argued to the habeas court that the petition should be assessed under the harmless beyond a reasonable doubt standard. The respondent never argued in the alternative that a higher standard of harmfulness should apply to collateral proceedings even if the petitioner's claim was not subject to procedural default, despite federal case law applying a higher standard since 1993. Accordingly, we conclude[d] that this [was] not the proper case in which to fairly address this consequential issue . . . ." Id., 485.

[11] Obviously, federalism and comity do not inform our determination of the proper standard to apply. Thus, I am not persuaded by the fact that federal courts have adopted the *Brecht* standard as the proper harmlessness standard for collateral review of a state conviction for constitutional errors or by the fact that a number of sister state courts have followed suit. As mentioned previously, we are not bound by federal law in determining the retroactivity of new judicial interpretations of substantive criminal law on collateral review, which is a matter of state law. Also, as the majority concedes, many jurisdictions, if not the majority of jurisdictions, apply the *Neder* standard on collateral as well as on direct review of state convictions for constitutional errors. See, e.g., *In re Martinez*, 3 Cal. 5th 1216, 1225, 407 P.3d 1, 226 Cal. Rptr. 3d 315 (2017); *Guam* v. *Ojeda*, Docket No. CRA10-011, 2011 WL 6937376, *13 (Guam December 23, 2011); *Hill* v. *State*, 615 N.W.2d 135, 140–41 (N.D. 2000).

Moreover, the present case, involving state court collateral review of a state conviction, is more akin to federal court collateral review of a *federal* conviction for constitutional error, than to federal court collateral review of a *state* conviction for constitutional error. There is currently a split among the federal courts of appeals regarding whether the *Brecht* standard applies to federal habeas review of federal court convictions, thereby suggesting that *Brecht* is not clearly the proper standard to apply in this case. See *James* v. *United States*, 217 Fed. Appx. 431, 435 (6th Cir. 2007) ("State court convictions are examined on collateral review to determine whether an error 'had substantial and injurious effect or influence in determining the jury's verdict.' . . . This standard does not apply to collateral review of [federal court] convictions, as [state court] convictions are entitled to special deference." (Citations omitted.)). But see *United States* v. *Smith*, 723 F.3d 510, 516 (4th Cir. 2013) (noting that United States Supreme Court has not decided this issue and applying *Brecht* standard because "society has the same interest in the finality of federal convictions as it does in state convictions"), cert. denied, 572 U.S. 1043, 134 S. Ct. 1774, 188 L. Ed. 2d 610 (2014).

[12] It makes sense for the respondent to bear the heavier burden of proving harmlessness on collateral review, such as in the present case, as the state not only was relieved of having to bear its burden of proving an element at the underlying criminal trial, but it was more likely to establish, even pre-*Salamon*, the underlying facts regarding the kidnapping, such as the timing and length of the restraint. In other words, although the state may have asked additional questions of the witnesses in light of *Salamon*, it was more likely to have put forth all of its admissible evidence regarding the crime, including the length of the restraint and when the restraint occurred in relation to other conduct, than the defendant was to have defended on grounds relevant to *Salamon*. The state typically attempts to provide the fact finder with a complete picture of the crime, whereas the defendant would have had no motivation, pre-*Salamon*, to ask questions and to offer evidence regarding the length and timing of the restraint that were unnecessary pre-*Salamon*.